1        UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE OTIS D. WRIGHT II, U.S. DISTRICT JUDGE

4

5  UNITED STATES OF AMERICA,

6           Plaintiff,

7      vs.                        Case No. CR-14-702,
                                  CR-15-103, CR 15-701
8
   JIAN SHENG TAN,

9
            Defendant.
10  _____/

11

12

13              REPORTER'S TRANSCRIPT OF
                 SENTENCING HEARING
              MONDAY, SEPTEMBER 9, 2019
14                 10:00 A.M.
               LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22

23  _____

24        TERRI A. HOURIGAN, CSR NO. 3838, CCRR
          FEDERAL OFFICIAL COURT REPORTER
          350 WEST FIRST STREET, ROOM 4311
25        LOS ANGELES, CALIFORNIA  90012
                  (213) 894-2849


                  UNITED STATES DISTRICT COURT

1          **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        NICOLA T. HANNA
         United States Attorney
5        BY:  KIM MEYER
              Assistant United States Attorney
6        United States Courthouse
         312 North Spring Street
7        Los Angeles, California  90012

8

9    **FOR THE DEFENDANT:**

10       HILARY LEE POTASHNER
         Federal Public Defender
11       BY:  CALLIE G. STEELE
              Deputy Federal Public Defender
12       Central District of California
         321 East Second Street
13       Los Angeles, California 90012

14
         Also present:  Cantonese Interpreter, Flora Qingling Zhong
15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
1              LOS ANGELES, CALIFORNIA; MONDAY, SEPTEMBER 9, 2019

2                            10:00 A.M.

3                             --oOo--

4

5              THE COURTROOM DEPUTY:  Calling Item No. 1,

6  CR 14-702, CR-15-103, CR 15-701, United States of America

7  versus Jian Sheng Tan.

8        Counsel, may I have your appearance, please?

9              MS. MEYER:  Good morning, Your Honor.  Kim Meyer on

10 behalf of the United States.

11             THE COURT:  Good morning, Ms. Meyer.

12             MS. STEELE:  Good morning, Your Honor.  Callie

13 Steele on behalf of Mr. Tan, who is being assisted by a

14 Cantonese language interpreter.

15             THE COURT:  Good morning, Ms. Steele.  Good morning,

16 Mr. Tan.

17      We are here for your sentencing.  Have you seen -- I'm

18 sure you probably have -- the pre-sentence investigation report

19 prepared by U. S. Probation and disclosed to the parties on

20 November 21st of 2018?

21             THE DEFENDANT:  Yes.

22             THE COURT:  All right.  A single report for all

23 three of your cases, and unless there is any objection, I will

24 handle all three of these cases simultaneously.

25      I notice that that is the way the parties addressed them
```

1    as did probation.

2          So is there any objection to us conducting the sentencing

3    hearing by dealing with all three cases simultaneously?

4                MS. STEELE:  No objection, Your Honor, from defense.

5                THE COURT:  Excellent.

6          All right.  In preparation for the sentencing, the Court

7    has reviewed the pre-sentence investigation report as well as

8    the submissions by the government and by the defense on behalf

9    of Mr. Tan.

10         All right.  To recap, on April the 11th of 2018, Mr. Tan

11   was convicted of Counts 1 and 2 under Case No. 14-cr-702, which

12   I will simply refer to as 702, convicted of Counts 1 and 2.

13         Count 1 charged a violation of Title 18, United States

14   Code, Sections 1956(h) and (a)(1) conspiracy to launder

15   monetary instruments.

16         Count 2 charged a violation of Title 18, United States

17   Code, Section 1956(a)(3)(B), laundering monetary instruments.

18         In Case No. 15-CR-00103, which I will refer to henceforth

19   as 103, he was convicted of Counts 1, 2, and 3.

20         Count 1 charged a violation of Title 18, United States

21   Code, Sections 1956(h) and (a)(1), conspiracy to launder

22   monetary instruments.

23         Count 2 charges a violation of 18, U.S.C.,

24   Section 1956(a)(3)(B), laundering of monetary instruments.

25         Count 3 charges a violation of Title 31, United States

1    Code, Sections 5324(a)(1) and (d)(2), structuring reporting

2    requirements to evade the reporting.

3         Case No. 15-CR-00702, Count 1 charges a violation of 18,

4    U.S.C., Section 1956(h) and (a)(1) conspiracy to launder

5    monetary instruments.

6         And Count 2 charges a violation of 18, U.S.C.,

7    Section 1956(a)(3)(B) laundering of monetary instruments.

8         Pursuant to guidelines Section 2S1.1(a)(2), this carries a

9    base offense level of eight.

10        Now, based upon the amount of money laundered and pursuant

11   to 2B1.1(b)(1)(E), because the laundered funds were more than

12   95,000 but less than $150,000 there is applied an eight-level

13   enhancement.

14        Because he believed that the laundered funds were

15   drug-related proceeds, a six-level enhancement is applied

16   pursuant to 2S1.1(b)(1)(B)(1).

17        An additional two-level enhancement is applied because he

18   stands convicted of Section 1956, and this is pursuant to

19   2S1.1(b)(2)(B).

20        Probation applied a four-level enhancement for his role in

21   the offense.

22        The government has made the argument that pursuant to the

23   terms of the agreement that the defendant should get the

24   benefit of his bargain and apply only a two-level role

25   enhancement, and from that, three levels are deducted for his

1  acceptance of responsibility, despite having gone to trial.

2      This then leads us to a final adjusted offense level of

3  23.

4      He has zero criminal history points, therefore, he falls

5  within Criminal History Category I.

6          MS. MEYER:  Your Honor, I may have misheard, but did

7  the Court reference that the defendant had gone to trial; he

8  did not, he pled.

9          THE COURT:  That's right.  He was going to be a

10 witness.  But yes, thank you.

11     All right.  That would leave us with a final adjusted

12 offense level of 23 and a guidelines range of 46 to 57 months.

13     However, the government has made a 5K motion which the

14 Court grants requesting a two-level downward departure which

15 then takes us to an offense level of 21 and a guidelines range

16 of 37 to 46 months.

17     The defense position seeks -- well, actually, let me just

18 stop right there.

19     Let me just stop with the calculation of the guidelines

20 range.

21     Prior to the government's motion and prior to the

22 government's recommendation that we not apply a four-level

23 enhancement for his role, we would, if I had a range of 57 to

24 71 months, but the Court has granted the 5K and the Court has

25 also gone along with the plea bargain in which the role

1   enhancement was only plus 2, okay.

2        So with the -- I don't imagine there is going to be any

3   argument that the 5K should not be granted.

4        So with the granting of the 5K, we then end up with a

5   guideline range of 37 to 46 months.

6        Is there any objection to that before we go any further

7   with the specific sentence recommendation?

8        Any objection from the government?

9            MS. MEYER:  No, Your Honor.

10           THE COURT:  Okay.  Ms. Steele?

11           MS. STEELE:  Your Honor, if I may just clarify.

12   Base offense level is eight plus eight for the loss.

13           THE COURT:  Yes.

14           MS. STEELE:  Plus two because he was convicted of

15   money laundering.

16           THE COURT:  Yes.

17           MS. STEELE:  Then the agreement upon role adjustment

18   plus two.

19           THE COURT:  Then plus six for the drug proceeds.

20           MS. STEELE:  Yes, Your Honor.  We're objecting to

21   that, but other than that, we do agree.

22           THE COURT:  Okay.  You realize that that was

23   specifically discussed that these were drug proceeds?

24           MS. STEELE:  Oh, yes, Your Honor.  But we have the

25   argument regarding the sentencing entrapment.

1          THE COURT:  Oh, yes.  The government has submitted a

2     response to that.  And I think the government's position is

3     well-taken.  So I appreciate the fact you object to the

4     application or the argument or contention that the drug

5     proceeds enhancement should be applied but the Court thinks

6     it's warranted under the facts of this case.

7          Now, the defense also is arguing or recommending no jail

8     time, but five years of probation with 12 months of home

9     detention with electronic monitoring.

10         The government -- the defense also objected to the

11    calculation or the number of participants because the

12    government has used the participants involved in each one of

13    these transactions.

14         Be that as it may, because the government has basically

15    taken the position now for sentencing purposes that the bargain

16    struck at the time of the plea agreement should be honored, and

17    instead of a four-level leadership role, there should only be a

18    two-level enhancement.

19         Does that satisfy the defendant's concerns?

20         MS. STEELE:  Yes, Your Honor.

21         THE COURT:  Okay, excellent.

22         Before I hear arguments or any supplemental arguments that

23    either side wishes to make, let me say this:  It had been my

24    initial belief that the original guidelines range, that is 57

25    to 71 months was a reasonable sentence, but I am prepared to go

1   along with the government's recommendation and primarily, based

2   upon the fact that he falls within Criminal History Category I

3   and he's otherwise led a law-abiding life, and he has expressed

4   a great deal of remorse for his involvement in this case, the

5   5K, of course, is significant importance as is the fact that he

6   is taking care of his parents and in-laws, et cetera, and it

7   looks like people need and depend upon him.

8        And he has discharged those familial obligations

9   honorably, I have no idea why he took this left turn in his

10  life.

11       But, all that to say, I am prepared to go along somewhat

12  reluctantly with the government's recommendation.

13       All right.  That being said, Ms. Meyer?

14           MS. MEYER:  Thank you, Your Honor.  The only thing

15  that the government would say is that it believes that -- it's

16  not the benefit of the bargain, for the plus two for

17  aggravating role, the government believes the facts support a

18  plus two, because if you look at the four transactions that the

19  defendant was involved in with respect to the conduct in the

20  15-103 case, generally, it was Co-Defendant Hung who took the

21  lead on that.

22       With respect to the 15-701 case, the defendant introduced

23  the source to Co-Defendant Jim Lee, and then Co-Defendant Lee

24  took it from there.

25       So it was only in the 14-702 case with his Co-Defendant

1    Tat and his wife, Ruimin Zhao, that he played more of an

2    instrumental role.

3        In evaluating his conduct in comparison with Co-Defendant

4    Tat, the government believes that the plus two was appropriate.

5                 THE COURT:  Okay.  Ms. Steele?

6                 MS. STEELE:  Yes, Your Honor.

7        Your Honor, I would first like to address the enhancement

8    for use of -- well, belief that it was from drug proceeds.

9        I believe that this case is sort of like the stash house

10   cases.

11       We have the government creating the crime, and then

12   finding someone to engage in it.

13       So what you have here is the informant going to Mr. Tan

14   and telling him he could have said these are robbery proceeds,

15   he could have said that it was some other, you know, ill-gotten

16   gains, but instead they specifically said "drug proceeds,"

17   which then makes an enhancement that is more than almost any

18   enhancement under the guidelines.

19       Your Honor, that is why we think that if the Court

20   considers this and sentencing manipulation as stated in *United*

21   *States versus Garza-Juarez*, which I cited in my papers, and

22   also the *Staufer* case, now, normally we see this in a drug case

23   where you have somebody who is not predisposed to engaging in

24   the transaction or that amount of drugs, but the government

25   somehow entraps them into doing it.

**UNITED STATES DISTRICT COURT**

1       So it's not perfect entrapment, it's imperfect entrapment.

2    That's what you have here.  You have Mr. Tan and the government

3    has created a crime, and they said, look, we have these

4    proceeds and guess what, it's drug proceeds.

5       And Mr. Tan says okay.  Then he engages in this conduct,

6    but it doesn't matter to him if its drug proceeds, he didn't

7    have anything to do with drug lifestyle, and it was something

8    that the government told the informant to say, but then, he

9    still receives a substantial increase.

10      So that's why we have asked the Court not to apply it, the

11   six-level enhancement for it being drug proceeds.

12      If you think about it, even in like the context of other

13   enhancements, if somebody has -- possesses a firearm in a drug

14   transaction, they get a two-level increase.

15      If they brandish the firearm, they get a little bit more.

16      If they shoot it, they get a little bit more.  It's not

17   six levels.

18      This is six levels because the government said just like

19   in a stash house case, and we remember the stash house cases

20   when they would say, it is 25 kilograms of cocaine, oh,

21   everyone is armed there, make sure you bring your friends.  And

22   then our clients would come with other people, guns, and have

23   huge mandatory minimums for the 25 kilograms of cocaine, which

24   never existed, which was a ten-year mandatory minimum and five

25   years usually for the gun.

1       So our clients were coming in with a 15-year mandatory

2   minimum on an offense that was created by the government.

3             THE COURT:  Do you realize we have got an

4   interpreter over here that is trying to keep up with you?

5             MS. STEELE:  I will slow down for you, Your Honor.

6   Thank you.

7       So similarly here, you have a crime committed by the

8   government, and as I indicated previously, the government could

9   have said anything.  They could have said, you know what, I

10  didn't pay taxes on this money, it's money from my restaurant,

11  but I want you to launder it for me.

12      And Mr. Tan would have -- in the state he was in at that

13  time, he would have said okay, sure.

14      But instead, the informant said, it's from drug proceeds,

15  and now six-level increase is being applied more than you would

16  get if you shot a gun off in a bank or brandished a firearm.

17      It doesn't really comport to what the conduct was,

18  especially since it's nothing that Mr. Tan controlled.

19      He didn't control what the informant said.  The government

20  did.

21      So, Your Honor, we would ask that the Court not apply the

22  six-level increase.

23             THE COURT:  Ms. Meyer, what about that?

24      Now, Ms. Steele adroitly calculated that she would get my

25  attention by mentioning "stash houses."

But this is one of those things where it does make me wonder.  It's almost like use of a computer in the possession of pornography cases, well computers are everywhere.

How can you exist or do anything without making use of the computer?

And how does -- how does the source of the funds really impact the evaluation of the culpability of the defendant? Does it really matter?

MS. MEYER:  Your Honor, I believe it does.  There are a few points I would like to raise once I had Ms. Steele's papers on this, and I have reviewed the cases, both the cases cited by Ms. Steele as well as the cases obviously that the government cited in its footnote in its April 15th response.

But, first of all, I think what Ms. Steele's argument ignores is the government's burden of proof regarding mens rea.

The government is obliged under the 1956 statutes to establish that a defendant knew or believed that the proceeds were from an SUA.

So that's the first point that we have to establish, specified unlawful activity.

So it can't just be any sort of crime.

Secondly, we have to -- the government, in its investigation, has to ferret out those individuals who actually are involved in money laundering and with that particular mens rea, and the way to do that is to tell them because when

1  Ms. Steele says it all fell on the government in terms of the

2  representation, what she ignores is once Mr. Tan heard that it

3  was drug proceeds, he went ahead.  He could have turned and

4  walked away, but he did not.

5          THE COURT:  Do you think that he would have walked

6  away if the representation had been made that these are

7  proceeds from Medicare fraud?

8      He is going to make a certain amount of money based upon

9  the amount of money laundered.

10      Does he really care about the source of the funds and how

11 does that further from societal interest the fact that now

12 we're going to punish more harshly money laundering of drug

13 proceeds as opposed to proceedings from some other illegal

14 activity?

15          MS. MEYER:  Your Honor, remember the investigation

16 that the government was involved in that spanned many years?

17          THE COURT:  Uh-huh.

18          MS. MEYER:  We were talking about generating

19 substantial amounts of cash, so, the government has to come up

20 with or the investigation has to come up with a plausible story

21 that accounts for a periodic infusion and request for

22 laundering periodic amounts of cash.

23          THE COURT:  Okay.

24          MS. MEYER:  I'm sorry.

25          THE COURT:  If that's all it is, that is a way to

1   basically support, you know, the back story here that this is

2   where the money is coming from and that will explain why every

3   now and then there is going to be a periodic need to launder

4   these funds.

5        If that is it, then why should the defendant be punished

6   more harshly if all you are doing is basically supporting your

7   legend?

8            MS. MEYER:  Your Honor, I have additional

9   information that I would like to convey to the Court.

10       So we obviously have to have an SUA.  We obviously have to

11  explain, as Mr. Tan introduced the source to other participants

12  like Co-Defendant Hung, Co-Defendant Lee, as well as others the

13  Court is aware of, the monies and these six related cases

14  ranged from relatively low amounts for the deals of 15,000 up

15  to 100,000 that happened repeatedly.

16       So the way for the source to maintain the rue regarding

17  what he was involved in, the easiest explanation would be

18  drugs.

19           THE COURT:  Okay.

20           MS. MEYER:  And in evaluating the cases that

21  Ms. Steele cites, it was very interesting to me because

22  obviously this tends to arise more in the drug context because

23  subsequent deals increase the drug quantity, and what would

24  have been a more apt comparison, although the government still

25  wouldn't believe that it would have been successful if the

1   government had said to Mr. Tan how about a 25,000 deal, how

2   about a $50,000 deal, how about a $75,000 deal, how about

3   $100,000 deal, but that is not the argument she's making, which

4   would have been probably more akin to what we would think of.

5        What she's saying is under the *Garza-Juarez* case is that

6   it supports a reduction for this representation.

7        But if you look at the facts of *Garza-Juarez* a little more

8   closely, what you find is this:  So the Court said -- the Court

9   actually focused on the fact that it believed that the

10  government had engaged in some type of outrageous government

11  conduct and granted a departure based on coercion and duress

12  under 5K2.12.  There is no coercion and duress here, which is

13  why the government wanted to provide to the Court the

14  transcript from September 29th, 2009, that the government

15  actually quoted in its April 15th paper.

16       And in that transcript -- where is it -- in that

17  transcript when defendant Derrick Cheung introduced Tan to the

18  source, Mr. Tan said, let's discuss the serious stuff first,

19  page 20.

20            THE COURT:  Uh-huh.

21            MS. MEYER:  Then the source says:  How long have you

22  been doing it, if you don't mind me asking.

23       Mr. Tan says:  Oh, it's been a while, but I stopped for a

24  while.

25       And the reason that is important, Your Honor, is when you

1    go continue -- and I'm going to jump a little bit ahead -- but

2    when they were negotiating a fee on page 29, the source says:

3    What about the fees?

4        And Mr. Tan said:  We demand 15 on our side.

5        Then the source on page 30 says:  I know before it was 8

6    to 10.

7        Mr. Tan says:  It was a long time ago.

8        You are saying long time ago.

9        Mr. Tan says, at least exceeding five years ago.

10       So, and then at page 46, Mr. Tan makes a reference that

11   they are going to be involved in this long term.

12       So, in contrast to *Garza-Juarez*, the government didn't do

13   anything that it remotely qualifies as outrageous government

14   conduct.

15       The defendant was more than willing -- and the same thing

16   with respect to the *Staufer* case that Ms. Steele cited to, from

17   1994.

18       In that case, the defendant had expressed a predisposition

19   in engaging in very small drug quantities, I think it was LSD

20   -- I might be wrong on the drug -- and the government came back

21   and asked for or encouraged him to engage in a deal of a much

22   greater magnitude and that is what the Ninth Circuit focused

23   on, it was the magnitude of that subsequent deal encouraged by

24   the government.

25               THE COURT:  Okay.

1          MS. MEYER:  Again, focused on misconduct by or at

2    least conduct that made the Court uncomfortable that the

3    government had engaged in.

4          THE COURT:  Okay.

5          MS. MEYER:  That's not what we have here.

6          THE COURT:  No.  I think if I'm understanding

7    Ms. Steele correctly, this isn't -- she isn't raising an

8    argument of outrageous conduct on the part of the government,

9    which I believe exists in the fake stash house cases.

10         It's the fact that a defendant is subjected to a much

11   harsher punishment, not necessarily based upon what that

12   defendant had done, but basically the story being told by the

13   government agents.

14         Now, I could be wrong here.  I may be taking an

15   oversimplistic view.

16         U.S. Sentencing Commission has decided for whatever

17   reasons to imply a pretty serious enhancement if the proceeds

18   being laundered were derived from drug transactions.

19         And I agree with Ms. Steele, why should that be so?

20         It doesn't demonstrate a greater criminal culpability on

21   the part of the defendant.  It is a creature of the imagination

22   of the Sentencing Commission that this should be so, and I

23   don't understand why.

24         MS. MEYER:  Your Honor, you know, it's interesting

25   because when we look at these investigations in hindsight,

maybe, you know, obviously we have a discussion about these
issues.

But, I think, you know, I can't remember which case it
was, but maybe *Anderson* when it talked about bank fraud. The
Ninth Circuit came back and said: If you tell somebody it's
bank fraud, you also have to say that it's FDIC-insured.

THE COURT: Uh-huh.

MS. MEYER: And drug dealers -- criminals don't talk
like that. They don't say, people who want to engage in
criminal conduct don't say, by the way, you know that these
proceeds, if it were from bank fraud, are FDIC-insured.

I think that what we forget here is that the source was
walking into these situations and he had to present a plausible
story.

The story that didn't -- it couldn't change based on the
amount, because he was getting introduced to a lot of people.

THE COURT: I got that.

MS. MEYER: Therefore, the drug proceeds is not
intended to increase his sentence, it is part of the -- it is
part of the credible story.

THE COURT: But it does increase the sentence.

MS. MEYER: That's right. And the Courts, according
to the two cases that Ms. Steele said, have granted a departure
not because of the fact that a representation was made that
results in an additional enhancement, but because they didn't

1    like the government conduct.

2              THE COURT:  Okay.

3              MS. MEYER:  And the Ninth Circuit in *Boykin*, the

4    case I cited, made very clear as I cite in my footnote:  Courts

5    have granted relief for sentencing manipulation and only the

6    extreme and unusual case involving outrageous government

7    conduct, that is jump cite 1360.

8         That, I think, has to control.  The sentence is not only

9    of Mr. Tan, but all of the defendants, because that we don't

10   have here.

11             THE COURT:  No, we don't.  That argument -- I don't

12   know if it's been abandoned or not, but you addressed it in

13   your papers very well.

14        All right.  I don't think we have got manipulation.  I

15   don't think that there is an allegation that the government was

16   engaged in some sort of misconduct.

17        I don't see that, and I don't believe that is Ms. Steele's

18   argument.

19        I think Ms. Steele's argument, again, you will correct me

20   if I'm misstating your argument, but there is something

21   fundamentally unfair that a defendant's sentence is appreciably

22   increased, not because of anything that defendant has done, but

23   because the Sentencing Commission has simply decided that in

24   money laundering cases if you launder drug proceeds, we're

25   going to spank you quite a bit harder.

1         And I am wondering why.  It is not the defendant who was

2    engaged in any drug transactions.  All the defendant is doing

3    is laundering the money, and quite frankly, the defendant

4    doesn't really care.

5         And he hasn't done anything more damaging to society's

6    interest by virtue of the fact that during discussions with a

7    government agent, the government agent said:  Oh, by the way,

8    this money has come from this source.

9         It doesn't really matter.  It doesn't alter what the

10   defendant has done.

11        The defendant is going to launder the money regardless of

12   where it came from.  He's going to get his cut.

13        I don't see the fairness in this arbitrary application of

14   a six-level enhancement, because during discussions, to set up

15   this operation and establish the bona fides of the government

16   agent, they come up with this story, that, by the way, these

17   are drug funds -- drug proceeds.

18             MS. MEYER:  Your Honor, I haven't looked at the

19   background about why the Sentencing Commission did the plus six

20   for believing that it was drug proceeds, but I will tell you

21   that you could certainly understand potentially why.

22             THE COURT:  Okay.

23             MS. MEYER:  And I'm just coming up with this

24   information to present to the Court based on my reading of the

25   paper.

1          THE COURT:  Okay.

2          MS. MEYER:  The opioid crisis, and the fact that you

3     have people willing to sell drugs with fentanyl in them and

4     that should make a difference to a defendant versus as the

5     Court posited, Medicare fraud.

6          Now, obviously this is a sting situation, and we don't

7     have the actual underlying drug transaction at issue, but

8     certainly, I could see why the Sentencing Commission would

9     place a greater concern over a defendant's willingness to

10    engage in criminal conduct irrespective of the fact that he or

11    she believes that that money came from drugs.

12         And you also notice in this specific offense

13    characteristics under 2S1.1(b)(1), it is not just a knowledge

14    that the -- or knowledge or belief that the laundered funds

15    were from drug proceeds but also a crime of violence, under

16    (ii) or an offense involving firearms, explosives, national

17    security, or the sexual exploitation of a minor under subpart

18    3(i).

19         Now, Ms. Steele makes reference to the 924(c) enhancements

20    and how they are incremental but not as significant as the drug

21    context here.

22         But what she overlooked is that there are three separate

23    passages under 2S1.1(b)(1), it is not specific or exclusively

24    identified with a knowledge of belief or drug proceeds.

25         Here, the Sentencing Commission has equated it to other

1    crimes as well that it considers equally serious.

2              THE COURT:  Which I think is almost absurd.

3              MS. MEYER:  Your Honor --

4              THE COURT:  Exploitation of children, national

5    security?

6              MS. MEYER:  Crimes of violence.

7              THE COURT:  Crimes of violence.  How do you equate

8    that with -- all right, this is money that was derived from

9    trafficking in narcotics.

10       Narcotics are horrible, but I don't think that someone

11   engaged in money laundering is going to be that nuanced and

12   that picky in terms of the source of the money.  Well, okay, I

13   will touch this kind of money, but I won't touch this kind of

14   money.

15             MS. MEYER:  The Sentencing Commission has said that

16   if you believe that it's from drugs, violence, firearms,

17   explosives, sexual exploitation of a minor, you are going to

18   face an increased guideline.

19       And that seems like a judgment that is not unreasonable,

20   given the situations or circumstances associated with that

21   particular or those kinds of offenses.

22             THE COURT:  Is the argument that the commission of

23   these other crimes is being promoted by the ease with which the

24   proceeds can be laundered; that crimes involving national

25   security or explosives or violence or exploitation of children,

1    that those things will be promoted based upon the ease with

2    which that money can be cleaned.

3         Is that the argument?

4              MS. MEYER:  Your Honor, I'm not --

5              THE COURT:  If not, then --

6              MS. MEYER:  I mean, the ease with which it's done,

7    I'm not quite understanding the Court's comment.

8              THE COURT:  Okay.  All right.

9         All of these crimes are engaged primarily for financial

10   gain.

11             MS. MEYER:  Uh-huh.

12             THE COURT:  And there is some incentive on behalf of

13   people who make a living from this to be able to clean that

14   money so that, you know, the FBI doesn't resume following

15   cookie crumbs.  It is to make the detection of either the crime

16   or individuals who are committing the crime, make that more

17   difficult by cleaning this stuff -- this money, run it through

18   a boutique, anything to clean the money.

19        Now, is the argument that the ease with which this money

20   can be cleaned affects the willingness of individuals to engage

21   in this kind of criminal activity?

22        For example, if I can get drug money cleaned fairly

23   easily, then okay, I'm going to be inclined to be a drug

24   dealer; is that the argument?

25             MS. MEYER:  Your Honor, I don't believe that the

ease with which the money can be cleaned is tied to the source
of that money.

      When I was talking about the --

            THE COURT:  Stop there, stop there.  Why do you say
that?

      Are you saying that money launderers are kind of picky
about the kind of money that they are going to try to clean?

            MS. MEYER:  Well, my point I raised was talking
about why in an investigation a source would talk about drug
proceeds, it was because they have to -- they are put in a
dangerous situation where they are surrounded by many
defendants or targets, and generally, they are by themselves.

      So in order to come up with a credible story that didn't
shift because people are going to be watching:  Huh, what, you
said the other day it was X, and now you are saying that it's
Y.  That's what I was -- excuse me, that's what I was referring
to.

            THE COURT:  I'm onboard with that.

      What government agents acting undercover say in terms of
trying to ingratiate themselves or establish their bona fides
with those who are otherwise engaged in criminal activities, it
has got to be believable.  I have got that, that is a real
dangerous undertaking.

      But right now, as in the stash houses cases, I guess to a
certain extent, it seems to me we should punish people based

```
 1   upon their conduct, their mental state, what they have actually
 2   done and how that in some way harms society or some societal
 3   interest.
 4        And this gentleman and others like him, if someone takes
 5   from the government, for example, and we're not going to talk
 6   about robbing a FDIC-insured institution, we're going to go
 7   back to Medicare fraud, I can see a much clearer line to
 8   damaging a great societal interest by stealing from a
 9   governmental agency that is designed -- its sole purpose is to
10   take care of and assist those among us who are most vulnerable.
11        I think that is reprehensible conduct.  But the mere fact
12   that someone would agree to launder those fraudulently-obtained
13   funds does not necessarily promote that activity, that
14   fraudulent activity.  It's going to exist regardless, isn't it?
15             MS. MEYER:  The Medicare fraud -- the underlying
16   fraud?
17             THE COURT:  Yes.  And drug trafficking because it's
18   profitable, all of these things are profitable.
19             MS. MEYER:  Well, I mean, Your Honor, I think you
20   could make the contrary argument.  Yes, I believe Medicare
21   fraud, being a government prosecutor, is also reprehensible.
22             THE COURT:  Yes.
23             MS. MEYER:  Generally speaking, you don't see the
24   kinds -- I would argue that you don't see the same kinds of
25   deaths that you are seeing from drug trafficking.
```

1           THE COURT:  No, absolutely not.

2           MS. MEYER:  As a consequence, I think that the

3    Sentencing Commission should rightly be concerned that it

4    didn't matter to this defendant or any other defendant that

5    this money came from drugs.

6           THE COURT:  I got you now, all right.

7           MS. MEYER:  This money, if it had been a money

8    laundering transaction that was not a sting money laundering

9    transaction would have meant that hundreds of thousands of

10   dollars, and in this case, frankly, I think the total was

11   $122,500, came from the sale of illegal drugs that put people

12   at risk of dying and that should make a difference.

13          THE COURT:  Okay.  All right.

14          MS. STEELE:  Your Honor, I have couple of points.

15          THE COURT:  Sure.

16          MS. STEELE:  I think the Court's example of it being

17   Medicare fraud proceeds is better, because under the guidelines

18   if it was robbery, if it was a crime of violence, it would have

19   still have the same equivalent enhancement.

20      But I think the Court's example is exactly right.

21      If the government had merely said, this is proceeds of

22   Medicare fraud, it would not have -- there is no evidence it

23   would have changed Mr. Tan's behavior.

24      Also, Your Honor, I looked carefully at 2B3.1, and if

25   someone -- if a threat of death is made, that is plus two, if a

1    dangerous weapon is brandished or possessed, that is plus

2    three, if a dangerous weapon was otherwise used, that is plus

3    four, we're still not up the six yet.

4         If a firearm was brandished or possessed, increased five.

5         Is the firearm was other used, increased six, so it has to

6    go all the way up to get the same six levels, then it was

7    discharged, it would be seven.  So this is akin to almost

8    discharging a firearm.

9         But actually, Your Honor, I believe the Court can address

10   this with a variance.

11        The government is saying that this is not sentencing

12   entrapment under the law, but the Court can address this with a

13   six-level downward variance.

14        And I just -- as the government was arguing, I believe

15   that the six-level enhancement actually does not apply because

16   it says under the Guidelines 2S1.1(b)(1):  If the defendant

17   knew or believed that any of the laundered funds were the

18   proceeds of or were intended to promote an offense involving

19   the manufacture, importation, or distribution of a controlled

20   substance or a listed chemical, then a six-level increase

21   applies.

22        Let's remember the categorical approach.

23        The government's informant just said it was from -- it was

24   drug proceeds which could have been possession, proceeds from

25   possession of marijuana.

1       It doesn't have to be the manufacture, importation or

2   distribution, it could be something that is not listed there.

3       He did not specifically indicate this is from the

4   manufacture, importation, or distribution of drugs.  It was

5   very vague.

6           THE COURT:  Ms. Steele, if this morning on the way

7   to work I put a kilo of marijuana in my briefcase, and by the

8   time I arrive at work that isn't going to transform into money,

9   so simple possession is not going to generate proceeds.

10          MS. STEELE:  There could be something that is not

11  manufacture, importation, or distribution.

12          THE COURT:  Well, I can't think of something that

13  doesn't involve distribution that is going to transform that

14  controlled substance into money.

15      There has got to be an exchange, doesn't there?

16          MS. STEELE:  Well, Your Honor, maybe someone is paid

17  to possess, to be the stash house.

18      Let's say they said:  Here we're giving you marijuana, you

19  keep it.  And then the person, the informant, is then charged

20  with possession of marijuana.  And he was going to get money --

21  he wasn't charged with distribution or manufacture or anything,

22  so, he was going to get paid money to possess the marijuana,

23  let's say.

24          THE COURT:  You and I both know that isn't going to

25  be the government's charge.

1          MS. STEELE:  No, no, but Your Honor, the point is it

2    wasn't specific enough when the informant said to Mr. Tan, you

3    know, it's from drug proceeds.

4          They didn't say it was for the manufacture, importation,

5    or distribution.  So, without more, because we all know what

6    the categorical approach, there could be something that he

7    meant or Mr. Tan might have thought that he meant that did not

8    fit within this definition.

9          So I believe that the Court can find that it does not

10   apply because it wasn't -- the statement wasn't specific

11   enough.

12         I'm sure the government is going to find the exact quote,

13   that it wasn't specific enough, or I think the Court, under the

14   argument that I have made that it's too draconian to give

15   Mr. Tan a six-level increase because the informant -- because

16   the agent told the informant, say it's from drugs instead of

17   say it's for Medicare fraud or say it's from something else.

18         I think the Court pointed out that all of the other crimes

19   that give you the six-level increase are pretty extreme.

20         Sexual exploitation of a minor, something involving

21   national security, something involving firearms and explosives.

22         I think that what the reason this is in the guidelines is

23   because what you normally would have is somebody that is

24   involved in drug trafficking.

25         And then they launder money, right, or they are involved

1  in the sexual exploitation of a minor, and then they launder

2  money.  So you have someone that is involved in that type of an

3  offense, and then they launder money so it's clear that is

4  where the money is coming from.

5      This is different, because Mr. Tan, and as the government

6  indicated, in the other transactions, not the one involving I

7  think it's 102, I forget, 702, except the one in 702, he was

8  really kind of like the middle man.  He introduced the

9  informant to someone then they went off and did the

10  transaction, and Mr. Tan was not involved.

11      The one he was most involved in is the one that went to

12  trial here that involved Vivian Tat and his wife, and that was

13  his involvement, in which he, as the Court knows, went to the

14  bank, figured out a way to get the money, you know, laundered.

15      So that's what you have here is an individual who has no

16  connection to drugs.  There is no evidence -- the government

17  hasn't presented anything that he's involved in drug

18  trafficking.

19      He comes into the purview of the informant and then the

20  informant himself says "drug proceeds."

21      And the government knows good and well that that is going

22  to give them a six-level increase.

23      But we believe that the Court can find that whatever we

24  have right here, whatever the government has presented to us

25  and what is in the pretrial -- the probation report is not

specific enough to say that Mr. Tan knew that the proceeds were

from an offense involving the manufacture, importation, or

distribution of a controlled substance or a listed chemical.

What drug was it?  We don't know.  What was -- how did the

person get the money?  We don't know.  It would have to be more

specific.

THE COURT:  Well, I'm having enough trouble with the

fairness of this to begin with, even if -- even if we come to

the conclusion that he somehow contributed to the proliferation

of drugs within the community which is reprehensible, that is

completely horrible.

But I do have a problem with this, I don't know if it's a

friendly problem, but you are right, there is a somewhat

ambiguous and loosey goosey way that he came into the

possession of the information that these were proceeds from an

offense involving drugs.

So here is what I'm going to do:  We will let the Ninth

Circuit, once again, tell me I'm wrong.

MS. MEYER:  Your Honor, may I just complete my

record?

THE COURT:  Let me finish my thought.

MS. MEYER:  Okay.

THE COURT:  But despite the fact that I may go along

with your argument in analyzing this case for purposes of

sentencing, I spent less time crunching the numbers than trying

1    to come up with what is a reasonable sentence.

2         And this little academic discussion we have had does not

3    change that conclusion as to what is a reasonable sentence for

4    this man's conduct.

5         So, I may lop off six levels, but impose the same

6    sentence.  If it was reasonable at 10 o'clock when we started,

7    it's still reasonable.  All we have done is change the

8    guidelines, okay?

9         So, go ahead.

10             MS. MEYER:  Your Honor, I just want to point out

11   that in defendant's plea agreement at pages 19 and 21, he

12   agreed when he signed the plea agreement that he was told that

13   the cash to be laundered involved proceeds from bank fraud and

14   drug trafficking.

15             THE COURT:  Okay.

16             MS. MEYER:  In addition, I don't think it's any

17   secret that drug traffickers, in particular, have trouble

18   getting their proceeds into the banking system.  I mean, there

19   was just a trial in New York on this.

20        So, that is part of that calculation that the urgency of

21   the scenario that the source presents is that he has cash that

22   is coming through his hands at regular intervals, that he needs

23   to get into the banking system.

24             THE COURT:  Again, that doesn't deal with the

25   defendant here.  It has nothing to do with the defendant.

1          MS. STEELE:  Your Honor, I would state for the

2     record, it would have to be that it was distribution of a

3     controlled substance or listed chemical.

4          Sometimes there is one point where it's a listed chemical

5     then another point where it's not a listed chemical, sometimes

6     the list changes, so the government would have to show it was

7     in particular -- it was specifically a controlled substance or

8     a listed chemical that was in fact illegal federally at the

9     time.

10         But, Your Honor, I would like to address the Court's

11    proposed way to deal with this.

12         I think that if the Court just finds that there is a

13    six-level variance; one, I would say that the Court could say

14    that it doesn't apply, that's what I would like the Court to

15    say first, it doesn't apply under 2S1.1(b)(1).

16         In the alternative, that it's a six-level variance because

17    the Court could take that into consideration under 3553(a).

18         And then if the Court wants me to address some of the

19    other issues at this point or does the Court --

20         THE COURT:  No, I appreciate the variance approach,

21    but my problem really is with what I perceive to be the

22    arbitrariness of the U.S. Sentencing Commission simply deciding

23    to whack somebody six levels for laundering what they believe

24    to be drug proceeds, because we know the ease with which they

25    come by this belief.

1      I just have a problem with that, that is a substantial

2  amount of time, and I'm going to strike that six-level

3  enhancement, which is going to take us down to what, 17?

4            MS. MEYER:  Your Honor, I may -- because this

5  particular six-level enhancement was contained in the plea

6  agreement signed by the defendant -- I may consider asking the

7  Court to declare breach.

8            MS. STEELE:  Your Honor, may we have a moment to

9  confer?

10           THE COURT:  Sure.

11           MS. STEELE:  Your Honor, I would ask the Court to --

12  I did reserve the right to argue for departures, so I would ask

13  the Court to find that this is a departure under sentencing

14  entrapment, or in the alternative, a variance.

15           THE COURT:  Tell me this, I have often wondered

16  about this:  You also enter into various agreements when you

17  put together your plea agreements.  The Court isn't a party to

18  that.

19      Now, is the Court obligated to honor the calculations that

20  counsel enter into?

21           MS. STEELE:  No, Your Honor.

22           THE COURT:  I think there would be a problem if the

23  Court altered the agreement or altered the guidelines range

24  upward if the defendant had made his decision to plead guilty

25  based upon the numbers presented in the plea agreement, but

1     we're not there.

2          I have a problem with what we're doing here despite the

3     negotiations that were entered into, I'm the one who now has to

4     impose the sentence.  I have a problem with using that

5     particular calculation, that enhancement of the guidelines.

6          I just don't like that, and I know it's an important

7     element.  I know we have to do it; otherwise, we would not have

8     been talking for the last half hour, and I'm going to strike

9     that.

10         I will take this down to an offense level of 17 with a

11    guidelines range of 24 to 30 months, and I'm going to create

12    less of an uproar by at least staying within those guidelines

13    and imposing a sentence of 30 months.

14              MS. STEELE:  Well, Your Honor, if I may address some

15    of my other arguments, Your Honor?

16              THE COURT:  You may.

17              MS. STEELE:  I would like to state for the record my

18    argument is a departure or a variance, which I did reserve

19    under the plea agreement, and also the Court is correct, we

20    have a paragraph in the plea agreement that says that the Court

21    is not bound by any of our agreements.

22         So the Court can definitely do what the Court has intended

23    to do.

24              THE COURT:  Well, you certainly argued, you know,

25    for a downward shift in what the parties had agreed to, you

```
 1    have done that -- you have done that on paper and eloquently
 2    and persuasively here this morning.
 3         But none of that changes the Court's initial conclusion
 4    that maybe something at or slightly under three years is
 5    reasonable.
 6              MS. STEELE:  Well, Your Honor, I would ask the Court
 7    to look closely at the recommendation of the probation officer.
 8              THE COURT:  I looked at it.
 9              MS. STEELE:  What I would like to point out to the
10    Court is the probation officer has not even considered the
11    government's downward adjustment for cooperation.
12         But they, in their determination, they came down to a
13    33-month sentence.  I'm not saying that is the right sentence.
14    I am saying they came up with a five-level variance because
15    they were at 25, and then based on, you know, the history and
16    characteristics of 3553(a) factors, they went down to 33, which
17    was a five-level variance.
18              THE COURT:  Sometimes I scratch my head when I read
19    these things.  They do what they do; they apply their judgment
20    the way they see fit and in good faith.
21         Sometimes I agree with it, many times I do not.
22         One of the things I am not is a rubber stamp for
23    probation.
24              MS. STEELE:  That's correct, Your Honor.
25              THE COURT:  I want you to understand that I'm
```

1  applying independent judgment.

2      I'm not an agent of the government or of U. S. Probation

3  and Pretrial Services.

4      I'm the one who has got to make this call here, and it's

5  an uncomfortable position to be in, but I spent a lot of time

6  thinking about what is reasonable here, and that is what I have

7  concluded.

8      One of the things, of course, I have taken into

9  consideration, that he's going to be taken away from his family

10  and being able to continue to provide care and benefits,

11  et cetera, to his aging parents and in-laws, I have taken that

12  into consideration as well.

13      And matter of fact, I would almost like to just not --

14  well, I would like to buy your proposal, but that is not going

15  to happen, because I do realize that other people are impacted

16  when we sentence someone.  I don't like impacting other people

17  who are otherwise innocent, but this foolishness has to stop,

18  okay?

19          MS. STEELE:  Well, Your Honor, it has stopped.

20  That's why I made the argument for post-offense rehabilitation.

21  The last time any of this has alleged to occurred was 2011,

22  it's now 2019, eight years later.

23          THE COURT:  I'm talking about the specific

24  deterrence.  I'm talking about the general deterrence goal.

25          MS. STEELE:  Yes, Your Honor, but I think that is

1      something that the Court should consider as I indicated a

2      post-offense rehabilitation.

3           This is a time period where he engaged in that conduct,

4      since that time, since 2011, I think it's 2010 or 2011, there

5      has been no allegations he has engaged in this conduct, and

6      that was, as the Court knows, before he was arrested.

7           This isn't someone who says, "Oops, I was arrested and

8      they caught me and stopped doing it.  It hasn't occurred since

9      2011.

10               THE COURT:  How do I make a distinction between they

11     caught me, oops, I better stop.  How is that different?

12          You call it rehabilitation.

13          If he's otherwise lived a life of crime, that was his

14     primary source of revenue, he has been in and out of the

15     penitentiary all of his life, and then he stopped, and we

16     haven't seen or heard from him in ten years, then I would start

17     thinking, okay, we have probably the appropriate term here.

18     But anyway --

19               MS. STEELE:  Sometimes --

20               THE COURT:  You don't know anything about what this

21     man has been doing.

22               MS. STEELE:  Well, Your Honor, we know what is in

23     the record and that's all we can know.

24               THE COURT:  That doesn't mean squat.

25               MS. STEELE:  Well, Your Honor, I don't think we want

```
 1    to --
 2              THE COURT:  Do you honestly believe that every time
 3    someone commits a crime, they are caught and convicted?
 4              MS. STEELE:  No.
 5              THE COURT:  Of course not.  I have no idea why
 6    people stand up here and make that argument all of the time.
 7    Well, they have not been convicted, therefore, they have led a
 8    law-abiding life; that is not necessarily true.
 9         Listen, you are way ahead on points, I don't understand
10    why you are still talking.
11              MS. STEELE:  Well, I wanted to address where the
12    Court should end up, and I do appreciate the Court going down
13    to 17.  But at 17, now the government has asked for a two-level
14    increase.
15              THE COURT:  No, I'm taking that into consideration.
16              MS. STEELE:  After the Court gets to 17, take a six
17    off, then it goes down to 15.
18              THE COURT:  Maybe I'm wrong.
19              MS. STEELE:  Probation started at 25, but they gave
20    four instead of two, so we start out at 23.
21         Then we take off the six.  We're at 17, and then the two
22    four cooperations were at 15 to 21.
23              THE COURT:  Okay.
24              MS. STEELE:  Now, Your Honor, at the 15- to 21-month
25    range, we would ask the Court to consider -- remember,
```

probation without even taking into account any of those other

things, requested a five-level variance -- I know the Court

does not have to follow that, but we have also asked the Court

to depart further either under 5K1.1 or by way of a variance.

And we believe that one of the things that the Court

should consider is the government asked for a two-level

decrease for substantial assistance, but Mr. Tan did meet with

the government repeatedly and was willing to testify, but it

was a very difficult situation, as the Court I'm sure is aware.

His wife was one of the co-defendants.

THE COURT:  And he was not forthcoming with respect

to his testimony regarding her.

So now, we're getting into an issue that is not going to

help him.

MS. STEELE:  No, no, no, Your Honor.  What I'm

saying is this, Your Honor, I'm just asking the Court to

consider all of the circumstances.

THE COURT:  You really don't want me to do that.

MS. STEELE:  No, no, no, let's not that consider

that at all.

I'm just saying that I think we can all appreciate that

having his spouse as the co-defendant was very difficult and

he's very remorseful for getting her involved in this.

THE COURT:  Yes.

MS. STEELE:  He has expressed that as we indicated

1  in our letters to the Court from family members and people that

2  he works with how they are very surprised that he was involved

3  in this conduct.  He is remorseful, he is extremely remorseful.

4          THE COURT:  I have got that.

5      Do you have another issue?

6          MS. STEELE:  What is that?  Do I have another issue?

7          THE COURT:  We have another issue.  Here is what I

8  want at this point:  I want us to go through here and calculate

9  this correctly.

10          MS. STEELE:  Okay.

11          THE COURT:  Then I'm going to impose what I believe

12  to be a reasonable sentence.

13      The other thing is this:  Our interpreter needs to be out

14  of here in about 55 minutes.

15          MS. STEELE:  We will finished by then, Your Honor.

16          THE COURT:  We haven't gotten to the nitty-gritty

17  yet.

18          MS. STEELE:  We will be finished by then.

19      Let's go back to calculate the guidelines.

20      So the base offense level is eight, plus eight for the

21  loss, that makes 16, right?

22          THE COURT:  Yes.  I'm taking out the six for money

23  laundering.  I'm sorry, I'm taking out the six for laundering

24  of drug proceeds.

25          MS. STEELE:  Okay.  So eight plus eight is 16, plus

```
 1  two, because he was convicted of a money laundering offense,
 2  that means 18.
 3              THE COURT:  Plus two for the role.
 4              MS. STEELE:  Plus two for the role, which is 20.
 5              THE COURT:  Minus three?
 6              MS. STEELE:  Minus three for acceptance, which is
 7  17.
 8              THE COURT:  And the 5K takes us down to 15.
 9              MS. STEELE:  15.
10              THE COURT:  And 15 leads us to 18 to 24?
11              MS. STEELE:  Yes, Your Honor.
12              THE COURT:  All right.  I'm not happy with that, but
13  did we do the numbers right?
14              MS. MEYER:  Your Honor, I'm sorry, I really have to
15  interject here.
16              THE COURT:  All right.
17              MS. MEYER:  According to what our current
18  conversation about the plus six, according to defendant's
19  obligations under the plea agreement, under paragraph 2(c) --
20              THE COURT:  Forget the defendant.  I'm having a
21  problem with the application of it.
22              MS. MEYER:  I understand, Your Honor.
23              THE COURT:  I think Ms. Steele has been very
24  careful.  She's been advocating a variance, and the parties
25  reserve the right to talk about variances and departures, and
```

1  that is fine, she's in fact -- you know what, here is the deal

2  with government lawyers, they don't play games and they stick

3  to the agreement and they are honorable, and I appreciate that.

4      This is me.  I'm having trouble applying this.  This isn't

5  an argument that Ms. Steele is making necessarily.

6          MS. MEYER:  Your Honor, I appreciate the Court's

7  comments, but the fact is when Ms. Steele says that she's

8  arguing for a variance or departure, she's doing so and has

9  already done so as will be transcribed by stating that the plus

10  six does not apply by arguing that it makes reference to

11  manufacture and not possession.

12      It talks about a controlled substance or a listed

13  chemical.  Those are direct challenges to the application of

14  the plus six, which she and her client signed.

15      Therefore, the government believes that under (2)(c) that

16  the defendant has breached the provision that says:  Abide by

17  all agreements regarding sentencing contained in this

18  agreement.

19      Therefore, under paragraph -- and I have to petition the

20  Court, I believe, I haven't actually declared a breach in the

21  middle of a hearing, but under paragraph 37(b), if a breach is

22  declared, the government is relieved of all of its obligations

23  under the agreement.

24          THE COURT:  Okay.

25          MS. MEYER:  Including the use of Hung's cooperation

```
 1  information, et cetera.
 2          THE COURT:  So the government would retract its 5K?
 3          MS. MEYER:  I'm not necessarily saying that, but
 4  there has been a shift -- it has been a very shifting landscape
 5  here.
 6          THE COURT:  Would you like to put this off for a
 7  while?
 8          MS. MEYER:  Yes.
 9          THE COURT:  Done.
10          MS. MEYER:  Thank you, Your Honor.
11          THE COURT:  How much time would everyone need?  A
12  month?
13          MS. MEYER:  I think two weeks should do it, Your
14  Honor.
15          THE COURT:  Is that okay?
16          MS. STEELE:  I just need to know the date, Your
17  Honor.
18          THE COURTROOM DEPUTY:  9/25 at 10 o'clock.
19          THE COURT:  9/25 at 10:00 a.m.
20          MS. MEYER:  September 25th, that is fine.
21          THE COURT:  Done, 9/25, 10:00 a.m.
22      We will reconvene and even if there is no agreement, if
23  you rip up the entire agreement --
24          MS. MEYER:  No, I understand, Your Honor.  I just
25  want to have an opportunity to evaluate, and also the Court
```

```
 1    suggested its proposed sentence, I want to make sure, you know,
 2    that when we reconvene Mr. Tan has an opportunity to allocute.
 3              THE COURT:  That is right.
 4              MS. MEYER:  So I just want to take a point and see
 5    where the government is in light of the statements made by
 6    defendant.
 7              THE COURT:  Sounds good.
 8              MS. MEYERS:  Thank you.
 9              MS. STEELE:  Thank you, Your Honor.
10              THE COURTROOM DEPUTY:  This Court is in recess.
11                         (Recess.)
12              (The matter concluded at 11:18 a.m.)
13                           *  *  *
14
15
16
17
18
19
20
21
22
23
24
25
```

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )

I, TERRI A. HOURIGAN, Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.

Date:  September 10, 2019


                    /s/ TERRI A. HOURIGAN
        _____
            TERRI A. HOURIGAN, CSR NO. 3838, CCRR
                 Federal Official Court Reporter