```
                   UNITED STATES DISTRICT COURT
                  CENTRAL DISTRICT OF CALIFORNIA
                  (WESTERN DIVISION - LOS ANGELES)


UNITED STATES OF AMERICA,      ) CASE NOs: 2:15-CR-00103-ODW
                               )           2:15-CR-00701-ODW
                 Plaintiff,    )           2:14-CR-00702-ODW
                               )
     vs.                       )            CRIMINAL
                               )
JIAN SHENG TAN,                )    Los Angeles, California
                               )    Tuesday, October 15, 2019
                 Defendant.    )    (10:04 a.m. to 11:22 a.m.)
```

                    SENTENCING AND JUDGMENT HEARING

               BEFORE THE HONORABLE OTIS D. WRIGHT, II,
                    UNITED STATES DISTRICT JUDGE



<u>APPEARANCES:</u>

For Plaintiff:              KAREN I. MEYER, ESQ.
                            U.S. Attorney's Office
                            312 N. Spring St., 15th Floor
                            Los Angeles, CA 90012

For Defendant:              CALLIE G. STEELE, ESQ.
                            Federal Public Defender's Office
                            321 East 2nd Street
                            Los Angeles, CA 90012

Cantonese Interpreter:      Flora Zhong

Court Reporter:             Recorded; CourtSmart

Courtroom Deputy:           Sheila English

Transcribed by:             Exceptional Reporting Services, Inc.
                            P.O. Box 8365
                            Corpus Christi, TX 78468
                            361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1    **Los Angeles, California; Tuesday, October 15, 2019; 10:04 a.m.**

2         **(Cantonese Interpreter Utilized for Translation)**

3                    **(Call to Order)**

4         **THE CLERK:**  Calling Item One; CR-14-702, CR-15-103,

5    and CR-15-701; United States of America versus Jian Sheng Tan.

6         Counsel, may I have your appearances, please.

7         **MS. MEYER:**  Good morning, your Honor.  Kim Meyer on

8    behalf of the United States.

9         **THE COURT:**  Good morning, Ms. Meyer.

10        **MS. GLANTON STEELE:**  Good morning, your Honor.

11   Callie Glanton Steele, here on behalf of Mr. Tan, who is

12   present and being assisted by a Cantonese language interpreter.

13        **THE COURT:**  Ms. Glanton Steele, good morning.

14        Mr. Tan, good morning, sir.

15        **MS. MEYER:**  Your Honor, I --

16        **THE COURT:**  Yes?

17        **MS. MEYER:**  Before -- I just want to alert the Court

18   to something that I didn't alert the Court to, on September

19   9th, when we were here before.

20        I don't know how -- it's obvious that Mr. Tan was a

21   cooperator, and a failed cooperator.  But I don't know how the

22   Court handles those hearings.

23        Because in the back of this courtroom is Michael

24   Schafler, one of the attorneys for co-Defendant Tat, in the 14-

25   702 case.

1          **THE COURT:**  Here's how I handle it.  I know that the

2   Court is supposed to make the final call with respect to the

3   degree of any deviation from the guidelines.

4          But my question is:  On what basis does the Court

5   make this determination?

6          You've suggested a two-level downward variance.  And

7   this is based upon, I guess, information that he's provided to

8   you.

9          On what basis do I know about the value of that

10  information?  What do I know about your investigation into

11  that -- the underlying case and how much assistance he was to

12  you?

13         Now, I certainly heard -- I heard about some --

14         **MS. MEYER:**  Does the Court have any problem with

15  Mr. Schafler being in --

16         **THE COURT:**  I'm not saying anything.  I'm not going

17  to say anything.

18         So the bottom line is, that's your call.  I never

19  interfere with the Government's recommendation.  Because I am

20  not in a much -- I am not in a better position at all to say

21  that two levels is inappropriate; it should be four levels or

22  16 levels.

23         I mean, where would I get any information to support

24  using my judgment as opposed to the Prosecutor's?  I just have

25  to trust you and trust your judgment.

4

1              **MS. MEYER:**  Your Honor --

2              **THE COURT:**  You said two levels?  Okay.

3         And I do realize that there was some problems, that

4    you weren't able to actually use him as a witness.  I do

5    remember that.

6              The mere fact that you're offering anything at all

7    kind of surprises me.  But maybe you got some use out of it.

8              And if you did, fine.  But you're in a much better

9    position to gauge the importance of whatever information you

10   got from him.

11             I am not going to interfere with that, period.

12             **MS. MEYER:**  That's fine, your Honor.

13             **THE COURT:**  Okay, all right.

14             **MS. GLANTON STEELE:**  But, your Honor, I did add

15   another exhibit, if I may call it to the Court's attention?

16             **THE COURT:**  Oh, hang on.

17             **MS. GLANTON STEELE:**  Defense Exhibit 1.

18             And it's the proffer letter -- one of the proffer

19   letters that Mr. Tan signed --

20             **THE COURT:**  Okay.

21             **MS. GLANTON STEELE:**  -- with the Government.

22             And I just wanted to put it in the record to indicate

23   that, when the Government wants to bind the Defendant and

24   Defense Counsel, they specifically state it.

25             In the proffer letter, at page one, it states --

1          **THE COURT:**  Wait a minute.  Wait, wait.  Does this go

2     to the issue of breach?

3          **MS. GLANTON STEELE:**  Yes, your Honor.

4          **THE COURT:**  We'll get there.  We'll get there.

5          **MS. GLANTON STEELE:**  Okay.

6          **THE COURT:**  You win.

7          **MS. GLANTON STEELE:**  Thank you, your Honor.

8          **THE COURT:**  All right.  Okay, let me go in something

9     of an order -- I will privet something.

10         Mr. Tan, have you seen the Presentence Investigation

11    Report prepared by U.S. Probation and Pretrial Services and

12    disclosed to the parties on November 21st of last year?

13         **THE DEFENDANT:**  Yes.

14         **THE COURT:**  Okay, all right.  Well, the Court has

15    certainly reviewed that, and taken another look at the plea

16    agreement and, of course, the sentencing position papers --

17    multiple sentencing position papers filed on behalf of the

18    Government, as well as Mr. Tan.

19         And in a moment, I will get to the issues that had

20    been raised in those supplemental papers.

21         All right, on April the 11th of 2018 -- let me see,

22    let me see, let me see.  Let me try to do this in some sort of

23    an orderly fashion.  Yes, okay.

24         Mr. Tan entered pleas of guilty to a total of seven

25    counts spanning three cases.

1          In Case Number 14-cr-00702 -- which I'll refer to

2   henceforth as "702" -- he entered a plea of guilty to Counts

3   One and Two of that indictment.

4          Count One charges a violation of Title 18, United

5   States Code, Sections 1956(h) and (a)(1); conspiracy to launder

6   monetary instruments.

7          Count Two charges a violation of 18, U.S.C., Section

8   1956(a)(3)(B); laundering of monetary instruments.

9          In Case Number 15-cr-00103, hereinafter, "103," he

10  pled guilty to Count One, which charges a violation of

11  conspiracy to lauder monetary instruments, in violation of 18,

12  U.S.C., Sections 1956(h) and (a)(1).

13          I apologize.  I'm sorry.  I was going way too fast.

14          In Count Two, which charges a violation of laundering

15  of monetary instruments, in violation of 18, U.S.C., Section

16  1956(a)(3)(B).

17          In Count Three, which charges structuring of

18  reporting in order to evade the cash reporting requirements

19  under the Banking Act, in violation of 31, U.S.C., Sections

20  5324(a)(1) and (d)(2).

21          And, finally, in Case Number 15-cr-00701,

22  hereinafter, the 701 case, he entered a plea of guilty to Count

23  One, which charges a violation of conspiracy to launder

24  monetary instruments, in violation of 18, U.S.C., Section

25  1956(h) and (a)(1).

1            And in Count Two, laundering of monetary instruments

2    in violation of 18, U.S.C., Section 1956(a)(3)(B).

3            All right.  Happily, the calculation of the final

4    adjusted offense level, as part of the plea agreement, has been

5    stipulated to by the parties.

6            All right, pursuant to guidelines, Section

7    2S1.1(a)(2), this carries a base offense level of eight.

8            To that, an eight-level enhancement is applied

9    because of the amount of money laundered.  It was greater than

10   $95,000, and less than $150,000.  And this is pursuant to

11   Guidelines Section 2B1.1(b)(1)(E).

12           An additional six-level enhancement is applied

13   because the laundering was of purported drug-related proceeds.

14   And this is pursuant to guidelines Section 2S1.1(b)(1)(B)(i).

15           And, Ms. Glanton Steele, we will get to your

16   objections on this momentarily.

17           **MS. GLANTON STEELE:**  Thank you, your Honor.

18           **THE COURT:**  An additional two-level enhancement is

19   applied because he stands convicted of Section 1956.  And this

20   is pursuant to Guidelines Section 2S1.1(b)(2)(B).

21           And then, of course, there is an additional two-level

22   enhancement for his leadership role in the offense.  And this

23   is pursuant to 3B1.1(c).

24           And though this does not appear in the plea

25   agreement, I assume that the Government is recommending a total

1    of three levels for his acceptance of responsibility.

2         **MS. GLANTON STEELE:**  Yes, your Honor.

3         **THE COURT:**  All right.  I may as well deal with this

4    now.

5         So before the Government's 5K Motion, we end up with

6    an adjusted offense level of 23.

7         Under 5K, the Government has recommended an

8    additional two-level adjustment, which takes us down to an

9    adjusted offense level of 21.

10        With zero criminal history points, he finds himself

11   in Criminal History Category I.  This then suggests a

12   guidelines range of 37 to 46 months.

13        Okay, let me see, let me see, let me see.  All right.

14   There are additional things that we need to talk about.

15        The Defense is seeking further adjustments.  But

16   before we get to that, are we all on board that we have

17   calculated the guidelines correctly?

18        Ms. Meyer?  Ms. Glanton Steele?

19        **MS. GLANTON STEELE:**  Yes, your Honor, so far --

20        **THE COURT:**  Yeah.

21        **MS. GLANTON STEELE:**  -- on behalf of the Defense.

22   Yes.

23        **THE COURT:**  Yes.  I haven't forgotten you.

24   Okay, Ms. Meyer?

25        **MS. MEYER:**  Yes, your Honor.

1          **THE COURT:**  Okay, now, let me deal with the breach

2   first.

3          I think Ms. Steele is -- Glanton Steele is correct --

4   I believe the Government is correct.  The Defense Counsel has

5   made arguments that would appear to be foreclosed by virtue of

6   the plea agreement.

7          And had those arguments or comments been endorsed by

8   the Defendant, then I would agree that there'd be a breach.

9          Now, we can do a couple of things here.  I'm not

10  really in favor of what I'm about to suggest, which is to

11  simply ask Mr. Tan whether or not he endorses your views,

12  Counsel.

13          And if he does, then I'm going to find a breach.

14          **MS. GLANTON STEELE:**  No, your Honor.  I don't think

15  that's the proper way.  Ms. Tan -- Mr. Tan can't be compelled

16  to testify.

17          **THE COURT:**  I agree.

18          **MS. GLANTON STEELE:**  And what the case law says is,

19  is the Court must determine, based on the record -- unless the

20  Court holds an evidentiary hearing -- whether or not the

21  Government has proven, by preponderance of the evidence, that a

22  breach -- that a knowing breach has occurred by Mr. Tan.

23          **THE COURT:**  Right.

24          **MS. GLANTON STEELE:**  The record, the way it is now,

25  is that there's no evidence that Mr. Tan breached the plea

1    agreement.

2              **THE COURT:**  I agree.

3              **MS. GLANTON STEELE:**  And one of the reasons why I

4    submitted the proffer letter, Defense Exhibit 1, is that the

5    Government states in the proffer letter that anything said by

6    the Defendant or Defense Counsel would be included as a

7    statement by the Defendant in a proffer session on that day.

8              **THE COURT:**  Okay.

9              **MS. GLANTON STEELE:**  The Government didn't do that in

10   their plea agreement language.

11             And they're bound by the literal terms of their

12   language -- because they're the drafter -- and its contract

13   principles.

14             So based on the record, as it stands now, there is no

15   breach.

16             **MS. MEYER:**  Your Honor, I would agree with the

17   Defense that there's no need to seek or determine whether the

18   Defendant adopts the arguments by Defense Counsel.

19             But I still would like to address some of the points

20   that Ms. Steele makes.

21             Ms. Steele states that the Government -- and I assume

22   she would agree that the Defense, as well, is bound by the

23   strict terms of the plea agreement.

24             And Paragraph 2C says that the Defendant is obliged

25   to abide by all agreements regarding sentencing contained in

1    this agreement.

2          One of those agreements was the plus-six for

3    believing that the proceeds came from drug money.

4          And separate and apart from whether or not this Court

5    is going to find a breach, the Government felt compelled to

6    declare a breach based on the Defense argument that the plus-

7    six did not apply.

8          Now, immediately -- just less than five minutes ago,

9    this Court asked the parties if the guidelines had been

10   calculated correctly, including the plus-six, under 2B1(b)(1).

11         That's the first time that the Government has heard

12   the Defense say that the plus-six applies.  That is their

13   obligation under the plea agreement.

14         The Government does not believe there's any daylight

15   between a Defense attorney and a Defendant.

16         If the Defense attorney is walking the Defendant back

17   from the plus-six, the Government believes that is a breach.

18         Separate and apart from that, the important thing is

19   that it appears the Defense now agrees that the plus-six

20   applies as a specific offense characteristic.

21         And that is the important thing for the Government.

22         Because, otherwise, the whole foundation of the plea

23   bargaining process is called into question when a Defendant and

24   a Defense attorney can sign a plea agreement where offense

25   characteristics are identified in the plea agreement, and then

1    come into Court and disavow them.

2            And that is what caused the Government concern back

3    on September 9th.

4            **THE COURT:**  Okay.

5            **MS. MEYER:**  Then when the Court asked -- well,

6    separate and apart from that, the Government believes that --

7    and maybe this is not the time to make this argument.

8            But I want to get to the part about unwarranted

9    sentence -- unwarranted sentencing disparities.  These would be

10   other Defendants.

11           **THE COURT:**  Okay, later.  Later.

12           Right now -- and this is a perfect time.  Because I

13   wanted to deal with -- with the argument that there's been

14   sentencing entrapment, *et cetera*.

15           So and I think -- I think this part and parcel of the

16   Defendant's argument that the Government is allegedly guilty of

17   sentencing entrapment.

18           Because the representation that was made with respect

19   to the source of the laundered funds was provided by a

20   Government agent.

21           I don't know where else it would come from.  But, in

22   any event, I believe that's the reason that the Defense takes

23   issues with this -- the plus-six.

24           But this fact or that argument existed at the time

25   that the plea agreement was negotiated and signed.  So how do

1    you go back on it now?

2           **MS. GLANTON STEELE:**  Well, your Honor, the Defense is

3    not going back on the argument.

4           Our argument --

5           **THE COURT:**  Okay, good.  Let's move on.

6           **MS. GLANTON STEELE:**  Okay, and if I just may explain

7    to the Court.

8           Our argument is that the six-level enhancement

9    applies.

10          **THE COURT:**  Okay.

11          **MS. GLANTON STEELE:**  And we're asking that the Court

12   vary six levels --

13          **THE COURT:**  Okay.

14          **MS. GLANTON STEELE:**  -- because of the unique facts

15   and circumstances in this case.

16          Under 3553(a), the Court can consider the unique

17   circumstances of each case.  And the unique --

18          **THE COURT:**  What's unique about this one?

19          **MS. GLANTON STEELE:**  Well, your Honor, if the Court

20   looks at Exhibit A -- and I've submitted a draft transcript

21   that the Government never had finalized, but a conversation

22   between Mr. Tan and the confidential informant.

23          And in that conversation -- it's Exhibit A to our --

24   our brief regarding opposing the breach.  And if the Court

25   looks at Exhibit A, page 3 -- let's see here.  Oh, I'm sorry --

1  page 2, it says, "The confidential" --

2              **THE COURT:**  Give me a second.

3              **MS. GLANTON STEELE:**  Okay.

4              **THE COURT:**  This is a transcript, right?

5              **MS. GLANTON STEELE:**  Yes, your Honor.

6              **THE COURT:**  I don't have a two.  I got page one, then

7  it goes to nine.

8              Oh, Exhibit A-2 -- 002?

9              **MS. GLANTON STEELE:**  Yes.

10             **THE COURT:**  Yeah, I got you.

11             **MS. GLANTON STEELE:**  And then, on Exhibit A, page 2,

12  about halfway down --

13             **THE COURT:**  Uh-huh.

14             **MS. GLANTON STEELE:**  -- the confidential informant

15  says, "This money is by means of juggling with the bank,

16  though, fraudulent means."

17             And then D.C. says, "The money's taken out from the

18  bank."

19             And then the informant says, "The bank.  You know how

20  these realtor groups are working out.  And, together, there are

21  also drug money included, commingled in those money."

22             And up a little farther, before that, it says, "Bank

23  fraud."  So the informant is presenting to Mr. Tan that it's

24  bank fraud money and drug money.

25             And Mr. Tan said, "That is the money all along.  This

1    money is cash."

2            The informant says, "That is -- you don't have to

3    worry where it's from.  Anyhow, when it comes, all will be

4    handed over to you in cash."

5            Mr. Tan, "What I just asked for is cash.  That's all.

6    I don't care where."

7            And then the informant says, "You don't care where it

8    came from, as long as it's cash, right."

9            Mr. Tan, "As long as it is cash."

10           **THE COURT:**  Okay.

11           **MS. GLANTON STEELE:**  And that's exactly what we

12   discussed at our last hearing, your Honor.

13           If they had said this money is from Medicare fraud,

14   Mr. Tan would have said, "I don't care, as long as it's cash."

15           **THE COURT:**  Okay.

16           **MS. GLANTON STEELE:**  So the reason this case is

17   unique is that, normally what you'd have is a Defendant that's

18   involved in a drug network.  And then someone says, "I need to

19   launder some drug money."

20           And they say, "Okay," because the Defendant is in the

21   business of drugs.

22           Mr. Tan had nothing to do with drugs.  The Government

23   isn't alleging that.

24           It was the Government that told their confidential

25   informant, "When you go and talk to him, make sure you say,

1    'it's from drug proceeds.'"

2              **THE COURT:**  Okay.

3              **MS. GLANTON STEELE:**  They said that.

4              Mr. Tan said, "I don't care where it's from."

5              The informant said, "You don't care where it's from,

6    do you?"

7              Mr. Tan said, "No.  As long as it's cash."

8              So the Court can apply the six-level enhancement, and

9    then vary six levels because this is not a situation where it's

10   clearly believed or actually is from drug proceeds.

11             This is something where the Government -- as I said

12   before, like in the stash house cases -- who knows the

13   guidelines -- they're ready with the guidelines.

14             They say to their informant, "Make sure you say,

15   'drug proceeds'; make sure you say, 'drug proceeds.'"

16             So the informant says it.

17             Mr. Tan doesn't say, "Oh, great.  Because I'm in the

18   drug business.  I only launder drug proceeds."  He says, "I

19   don't care what it is.  You don't have to talk to me about

20   that, as long as it's cash."

21             Then the Government decides -- drafts the plea

22   agreement and then puts everything together, saying, "Drug

23   proceeds; drug proceeds."

24             This Court can look at the facts and circumstances of

25   the offense and take the guidelines, as the parties have agreed

1   to, plus six, and say, "Under these circumstances, where six

2   levels, as we argued and talked about last time, is akin to

3   shooting a gun off at a bank during a bank robbery."

4        Where the six levels is something that was suggested

5   by the Government to the informant, and is now being attributed

6   to Mr. Tan, who had no -- didn't care where the proceeds came

7   from.  That's a case where a variance is warranted.

8        So we're asking the Court to say, "Okay."

9        But because this Defendant didn't care if it was

10   Medicare fraud or drug proceeds, was told -- from the

11   transcripts -- "It's commingled with drug proceeds," said, "I

12   don't care," under those circumstances, a variance is

13   warranted."

14        So we're asking the Court to vary six levels.  And

15   that would bring us to an Offense Level 15.

16        Your Honor, as we discussed last time, it wasn't

17   Mr. Tan.

18        It would be different if Mr. Tan had said, "I'm a

19   money launderer, and I only launder drug proceeds.  Because the

20   money comes in fast, there's a lot of money, and I like to keep

21   doing it."

22        He didn't say that.  He said, "I don't care where it

23   came from."

24        And under those unique circumstances -- and it's --

25   when it's the Government that's telling the informant to claim

1    that it's drug proceeds -- a variance is warranted.

2          Because now he's in the same position as if that same

3    informant had said, "It's from Medicare fraud."

4          **THE COURT:**  What's the purpose behind applying --

5    really quite a serious enhancement if the funds being laundered

6    are drug proceeds?

7          Do you have any idea at all what the policy is behind

8    this fairly large enhancement?

9          **MS. GLANTON STEELE:**  Your Honor, I don't know what

10   the sentencing commission was thinking.

11         And as the Court pointed out last time, all of the

12   other factors that the Court would consider to make it a six-

13   level enhancement would be things that are extremely serious,

14   such as involving firearms; explosives; national security; the

15   sexual exploitation of a minor; or a crime of violence.

16         That's how you get the increase by six levels.

17         That's why, in this unique circumstance, where -- and

18   like I said, your Honor, if my client was a drug dealer and

19   this is a money laundering case, I wouldn't be making this

20   argument.  Because it would be clear that he thought it was

21   drug proceeds, he was in the drug business.

22         And, perhaps what the sentencing commission was

23   thinking is, people that are really involved in the drug

24   business should get a higher enhancement.

25         The sentencing commission didn't account for someone

1    who indicated, in their statement, that they didn't care where

2    the proceeds came from.

3              And the Government's own informant said, "Right?  You

4    don't even care where this comes from?"

5              And Mr. Tan said, "Right, as long as it's cash."

6              That is not contemplated by the guidelines.

7              So we're asking that the Court apply the enhancement,

8    but then adjust it with a variance because of the circumstances

9    of this offense.

10             **THE COURT:**  So he should get rewarded for absolutely

11   no scruples whatsoever?  He will launder anything.

12             **MS. GLANTON STEELE:**  No.

13             **THE COURT:**  Now, your experience and mine are

14   obviously different.

15             Generally, the folks that I see that are involved in

16   the drug business aren't also money launderers.  The money

17   launderers, that's what they do.  They launder money.  And they

18   benefit some other illegal activity.

19             Apparently, the U.S. Sentencing Commission felt that

20   that other activity, i.e., drug trafficking, is sufficiently

21   undesirable; that those who facilitate that activity, by

22   cleaning up the proceeds, should get spanked.

23             And I don't see any reason why I should differ with

24   their conclusions.

25             You saying that he doesn't care where the money comes

1    from does not appear to be -- to me, to be something that's

2    laudable.

3            **MS. GLANTON STEELE:**  Well, your Honor, I believe that

4    what the sentencing commission was attempting to address --

5            **THE COURT:**  Okay.

6            **MS. GLANTON STEELE:**  -- are, people that are involved

7    in illegal activity and --

8            **THE COURT:**  -- facilitating another illegal activity.

9    That's your client.

10           **MS. GLANTON STEELE:**  Well, your Honor, my client was

11   laundering, and --

12           **THE COURT:**  Okay.

13           **MS. GLANTON STEELE:**  He was laundering money.

14           **THE COURT:**  Right.

15           **MS. GLANTON STEELE:**  And the informant came to him

16   and said, "We have some money from bank fraud and some drug

17   proceeds" --

18           **THE COURT:**  Uh-huh.

19           **MS. GLANTON STEELE:**  -- air quotes -- "do you want to

20   launder it?"

21           And he said, "I don't care where it comes from" --

22           **THE COURT:**  Right.

23           **MS. GLANTON STEELE:**  -- "as long as it's cash."

24           **THE COURT:**  And he should get a pat on the back for

25   that?

1          **MS. GLANTON STEELE:**  No, no, your Honor.  It's not a

2     pat on the back.  It's still --

3          **THE COURT:**  It's more than a pat on the back.  You

4     want a six-level downward variance.

5          **MS. GLANTON STEELE:**  Well, your Honor, it's still a

6     substantial sentence for an individual who has never gone to

7     jail before.

8          This is an individual who has Criminal History

9     Category I; no criminal history points.

10          We don't often find that.

11          **THE COURT:**  No?

12          **MS. GLANTON STEELE:**  So the Court knows some of the

13     history.  We did apply for CASA for Mr. Tan.

14          **THE COURT:**  Right.

15          **MS. GLANTON STEELE:**  We thought that he would be an

16     excellent candidate.

17          **THE COURT:**  Uh-huh.

18          **MS. GLANTON STEELE:**  But he didn't receive CASA.  And

19     one of the reasons was, is he didn't have anything to work on.

20          He didn't have a drug problem or an alcohol problem.

21     That is what I was told, is that that's why he didn't get CASA.

22          So this is someone who could have benefitted from

23     that program, but was denied because he really has lived a good

24     life --

25          **THE COURT:**  Okay.

1      **MS. GLANTON STEELE:**  -- except for this.

2           And so, when you take everything together, the

3    history and characteristics of the Defendant -- like I said, if

4    I had someone here that had a record of dealing in a drug --

5    you know, drug sales and things, and then, maybe, stepped back

6    a little, dealt with their old friends and then laundered money

7    and it was drug money, and then an informant walked in and they

8    laundered drug money, that would be different.

9           I think that's what the sentencing commission was

10   targeting.  Not somebody who is approached by the informant,

11   and the informant says, you know, "Hey, this is what it is."

12   And then he unequivocally states, "I don't care what it is."

13          If the informant had come and said, "It's Medicare

14   fraud money," he would say, "Okay, I'll do it."

15          And it's not a pat on the back.  It's what is conduct

16   that needs a longer sentence?  What is conduct that is more --

17   who is more culpable?

18          Someone who's in the drug trade and then launders

19   money or someone who works at a restaurant as a chef and gets

20   an opportunity because they're a little bit low on money and

21   they have a lot of responsibilities?

22          I'm not saying that it's right.  But these are the

23   circumstances -- who's supporting a family; his mother-in-law,

24   his parents, and then he takes the easy way out.

25          And someone comes to him and says, "Here's some money

1  laundering."  And the unequivocal facts are that he didn't care

2  where it came from.

3        **THE COURT:**  You know, I hear what you're saying.  And

4  here's the deal.  Here's the hurdle that you've got to climb

5  with me.

6        This argument that he doesn't care -- and, for that,

7  it should have a neutral effect.  He just doesn't care.

8        And as you're talking, I'm sitting here thinking of a

9  number of things, where I would find that to be a horrible

10 position for someone to take -- that they just don't care.

11       Maybe they're into prostitution, and then maybe

12 someone presents them with a sweet, young thing, and says, "By

13 the way, she's only 12.  She looks a little older, but she's

14 only 12."

15       "I don't care."

16       Wouldn't that make your skin crawl?

17       "I don't care."

18       **MS. GLANTON STEELE:**  Your Honor, that's much

19 different.

20       **THE COURT:**  Why is it different?

21       **MS. GLANTON STEELE:**  It is different, because this is

22 not a sex crime against a minor.

23       **THE COURT:**  Okay, there are some things that we just

24 simply will draw the line at, right?

25       **MS. GLANTON STEELE:**  Well, and no one said to him,

1    "This is money that I've obtained because I'm -- you know, I

2    have prostitutes who are minors."

3         It's nothing like that.  This is something where --

4    and think of the situation, too, your Honor, you have an

5    informant who -- and I think the Court has seen the record from

6    the other cases -- this is someone who comes to Mr. Tan, not --

7    from the transcripts -- not speaking in, you know, street lingo

8    and talking about drug transactions -- but says, how do you say

9    it in -- I think he says, "How do you say it in Cantonese?" or

10   "How do you say, 'bank fraud'?" -- was one of the first things

11   that he says.

12        So he's there, speaking in -- I believe it's

13   Cantonese, how do you -- oh, "How do you say, in Chinese, how

14   do you say, 'bank fraud' in Chinese?"

15        So this is someone who doesn't sound like they're out

16   in the streets, you know, engaging in the conduct that the

17   Court's talking about or in drug trafficking; but says, "How do

18   you say, 'bank fraud'?  Oh, yeah, this money is from bank fraud

19   and drug proceeds."

20        And then Mr. Tan just says, "As long as it's cash."

21        He didn't -- if they had said, "It's from -- because

22   we're -- it's human trafficking," you know, if there's no

23   evidence that he would have said, "Oh, who cares," to something

24   like that.

25        But they said, "Commingled bank fraud and drug

1    proceeds."

2          Under these circumstances, your Honor -- and I just

3    would like to take us back to when the Government is creating

4    the crime, like in a stash house case, that's something that

5    the Court has to consider when thinking of the unique

6    circumstances of the offense.

7          And I bring the Court back to that because I think

8    that this is just really another version of it; where they

9    decided -- the Government decided, "We're going to say it's

10   drug proceeds."

11         And whoever -- whatever -- and I don't know exactly

12   who it was.  But somebody was talking to the informant, saying,

13   "You need to go -- we need you to get this information.  We

14   need you -- you know, you're going to go out there, you're in a

15   sting operation.  Make sure you say, 'drug proceeds'."

16         The same person with the guidelines in their office

17   is saying, "Make sure you say, 'drug proceeds'."

18         So the Government sets it up so that the informant

19   says, "Drug proceeds."  Drug proceeds are mentioned.

20         Mr. Tan says, "Okay."  He money launders.  And now he

21   has a six-level enhancement.  And it harkens back to the

22   Government saying, "Say drug proceeds."

23         And I think that, with the variance -- I mean, this

24   is exactly what 3553(a) is for.  The Court is to consider all

25   the circumstances.

1          **THE COURT:**  Uh-huh.

2          **MS. GLANTON STEELE:**  Look at Mr. Tan's history.  Does

3   he have any history with drug trafficking?  No.

4          Look at Mr. Tan's history.  Does he have any prior

5   convictions?  No.

6          Look at Mr. Tan's history.  Did he feel overextended

7   and wanted some quick money?  Yes.

8          Is that bad?  Yes.  He's going to be punished for it.

9          But should he be punished for it similar to as he had

10  walked into a bank and shot in the air?  No.  Not Mr. Tan.

11         Maybe somebody that was involved in sexual

12  exploitation of a child or explosives or national security.

13  But not someone who, with his history, with these circumstance,

14  with an informant that says, "How do you say 'bank fraud' in

15  Chinese?  Oh, yeah.  It's bank fraud and drug proceeds."

16         And Mr. Tan says, "I don't care, as long as it's

17  cash."  And then engages in it.

18         And then, like I argued before, your Honor -- and

19  then after the conduct in these indictments, there's nothing.

20         And I know the Court is saying nothing that he was

21  arrested for.  But I have clients that, even when they're --

22  when the Government hasn't picked them up, they continue in

23  whatever it is they were doing and get arrested and arrested

24  and arrested.

25         There's no evidence of any arrest or anything after

1  the conduct in these indictments.  You just have someone who's

2  working hard.  His co-workers are saying this is out of

3  character for him.

4        He's, you know, working as a chef in a restaurant,

5  six days a week, ten hours a day, supporting his family.

6        Both of his children are in college.  His son Sonny

7  is in his third year of college, actually took a few years off

8  because of this case.

9        His son Ricky had just started college.  He graduated

10 in June, and is now attending both -- attending Cal State, Los

11 Angeles.

12        **THE COURT:**  Where's the other one going to school?

13        **MS. GLANTON STEELE:**  Both going to Cal State, Los

14 Angeles.

15        **THE COURT:**  Okay, thank you.

16        **MS. GLANTON STEELE:**  Yeah.  So this is someone --

17 when you take all this into account, your Honor, this is

18 someone who is doing something right.

19        **THE COURT:**  Uh-huh.

20        **MS. GLANTON STEELE:**  He's raising his children,

21 they're in college, he's working hard, he hasn't been arrested.

22 He was only arrested this one time, for this offense, that

23 dates back nine years.

24        So when you take all that into account and consider

25 that, is a six-level variance appropriate?

1          It is.  It is, because it was the Government that

2   created the origin of these proceeds.  And it was nothing that

3   Mr. Tan did.

4          **THE COURT:**  Where else would that information come

5   from?

6          In a normal money laundering scheme, where would the

7   money launderer acquire the information as to the source of the

8   funds to be laundered?

9          **MS. GLANTON STEELE:**  Your Honor, I think it would be

10  obvious.  I think if --

11         **THE COURT:**  I do too.  Therefore, this -- I don't

12  understand why we're arguing about this.

13         It's like where else is the information going to come

14  from other than the client?

15         **MS. GLANTON STEELE:**  Oh, I don't know.  I don't

16  understand the Court's question.

17         Other than the client?

18         **THE COURT:**  Yeah.  The client who is bringing in the

19  money to be laundered.

20         **MS. GLANTON STEELE:**  Oh.

21         **THE COURT:**  That's the only source of the information

22  as to where that money came from, right?

23         **MS. GLANTON STEELE:**  Right.  Well, my client didn't -

24  - well, the informant brought it to Mr. Tan.

25         **THE COURT:**  Yeah.

1          **MS. GLANTON STEELE:**  Right.  So, normally, in the

2     real world --

3          **THE COURT:**  Uh-huh.

4          **MS. GLANTON STEELE:**  -- you'd have an individual who

5     is involved in drug trafficking.

6          **THE COURT:**  Uh-huh.

7          **MS. GLANTON STEELE:**  Then somebody says, "You know

8     what, I got $100,000.

9          **THE COURT:**  Uh-huh.

10          **MS. GLANTON STEELE:**  I got to clean it up.

11          **THE COURT:**  Uh-huh.

12          **MS. GLANTON STEELE:**  And then they bring it to that

13     person and they --

14          **THE COURT:**  Yes.

15          **MS. GLANTON STEELE:**  -- say, "Oh, I have a business.

16     I have a car wash."

17          **THE COURT:**  Right.

18          **MS. GLANTON STEELE:**  "I'll just send it right through

19     the car wash."

20          Or, "I have -- I'll write some checks for you.  Just

21     give it me and we'll put it in our -- we'll put it in bank

22     accounts, less than $10,000 each.  And then, you know, we'll

23     get it to you through those bank accounts."

24          **THE COURT:**  Well, whoever it is that needs the money

25     laundered, that's the person who supplies the information as to

1    where the money came from.

2          **MS. GLANTON STEELE:**  Right.  And it would be credible

3    information.  It would be somebody who is --

4          **THE COURT:**  Okay.

5          **MS. GLANTON STEELE:**  -- involved in the drug trade.

6          And that's why this is different.  Because it was

7    information that was created, not people that are involved in

8    the drug trade that are suddenly trying to launder money.

9          And I think that that's what the sentencing

10   commission was aiming for.

11         **THE COURT:**  Okay, well, all right, fine.

12         Yes, Ms. Meyer?

13         **MS. MEYER:**  Your Honor, actually, Ms. Steele is

14   incorrect regarding what the sentencing commission was aiming

15   for.

16         In the Government's declaration of breach pleading,

17   filed September 24th, on page 19, the Government quoted, from

18   the United States Sentencing Commission Guidelines manual,

19   Appendix C, Volume II, Amendment 634.

20         And that amendment, which happened on November 1,

21   2001, said that the -- this particular guideline was amended to

22   provide -- and in here -- and here I'm quoting -- an

23   enhancement designed to reflect the differing seriousness of

24   the underlying conduct that was the source of the criminally

25   derived funds.

1          Subsection B(1) provides a six-level enhancement for

2     third-party money launderers who knew or believed that any of

3     the laundered funds were the proceeds of or were intended to

4     promote certain types of more serious underlying criminal

5     conduct.

6          And then in footnote seven of that same pleading, on

7     page 19, the Second Circuit, in the connect case, recognized

8     this when it said, quote, in expanding Section 1956(a), in

9     1988, to reach not only a defendant who knew that the money

10    laundered was, in fact, proceeds of a specified unlawful

11    activity, but also a defendant who believed the money to be

12    such proceeds based on a representation made by a law

13    enforcement officer, Congress plainly intended to cast its net

14    over defendants caught in sting operations.

15         Now, separate and apart from what the sentencing

16    commission has done, in coming up with specific offense

17    characteristics, under 2S1.1, I think the Court hit the nail on

18    the head when the Court said, "Isn't it more culpable when the

19    Defendant says, 'I don't care'"?

20         That is exactly the Government's point.  The point at

21    which this Defendant, as well as other co-Defendants in his

22    three indictments, were told that it was drug money, it did not

23    cause them to walk away.  They did not care.  And that is more

24    culpable.

25         So, for example, with respect to the 15-701 case that

1    went to trial in May of last year, you had co-Defendant Hua

2    Leung, who was the only Defendant who went to trial.

3          His offense level was 18; his criminal history

4    category was I.  I can't remember whether he had zero criminal

5    history points or not.  One of them did.  I didn't happen to

6    note it.

7          His range was 27 to 33 months.  The recommendation

8    came back from Probation at 18 months.  And the Court imposed

9    18 months.

10         Now, with respect to Jimmy Lee, his offense level was

11   21; his criminal history category was II.  And his range was 41

12   to 51 months.  The recommendation came back at 41 months and

13   the sentence imposed was 36 months.

14         Derrick Cheung, in the 15-103 case, had an offense

15   level of 16; Criminal History Category I.  The range was 21 to

16   27 months, and Probation recommended 12 months and a day, and

17   this Court sentenced the Defendant to 12 months and a day.

18         All of those Defendants engaged in one money

19   laundering deal.  Just one.

20         This Defendant engaged in four money laundering deals

21   that spanned 13 months.

22         Even that -- even given those facts, the Government

23   is always attempting to be fair, as well as equitable with

24   other co-Defendants.

25         So, for example, when the Government was not able to

1    call Mr. Tan as a witness -- because we believed that he was

2    not being entirely truthful with us regarding the conduct of

3    his co-Defendant wife.

4          Technically a breach.  He lied to us -- we did not

5    call a breach.  We understood the circumstances of that.

6          And even then, because he came in and proffered many

7    times with us, does the Court ask, "Why did the Government give

8    minus-two levels?"

9          Because he did come in and proffer with us.  And he

10    gave us information regarding Mr. Schafler's client Vivian Tat.

11          So while we couldn't use it at trial, we have, at all

12    points, tried to be fair.

13          Now, with respect to -- while the -- it's well within

14    the Court's discretion, and, frankly, within the Defendant's

15    right, to argue for a variance.

16          But a minus-six variance based -- I think my breach

17    pleading made it pretty clear -- on sentencing entrapment and

18    sentencing manipulation simply does not apply.

19          And even the guideline range, as calculated by the

20    Government, came up with an offense level that was -- offense

21    level of thirty -- 21 --

22          **THE COURT:**  Uh-huh.

23          **MS. MEYER:**  -- which was a guideline range of 37 to

24    46 months.  The Government even recommended 36 months.

25          **THE COURT:**  Uh-huh.

1          **MS. MEYER:**  So what the Government's argument is,

2     that given what those other Defendants received participating

3     in one deal, and given what this Defendant did, a 36-month

4     sentence is appropriate.

5          And a minus-six levels off for a variance is simply

6     not supported by the facts.

7          **MS. GLANTON STEELE:**  Your Honor, I don't -- the

8     Government has just argued information that isn't -- I'm not

9     privy to.  Because I don't have the Presentence Reports of the

10     co-Defendants.  So --

11          **THE COURT:**  Which information do you question?  The

12     criminal history categories?

13          **MS. GLANTON STEELE:**  No, no, no.  I would just ask

14     that she repeat it.  Because I couldn't -- as she went through,

15     that's something I hadn't heard before.

16          But if she could just repeat who the Defendants were,

17     what the range was, and what their sentences were, then I can

18     address it.

19          **THE COURT:**  Okay, would you mind?

20          **MS. MEYER:**  No problem, your Honor.

21          So CR-15-701; United States versus Jim Lee.  Two

22     Defendants, besides your client, were implicated in that case -

23     - indicted in that case and convicted.

24          Hua Leung went to trial in May of 2018.  His offense

25     level was 18; his criminal history category was I.  The PSR

1 came back with a guideline range of 27 to 33 months.

2            This Court sentenced him to 18 months, based on a PSR

3 recommendation of 18 months.

4            He went to trial.

5            Co-Defendant Jim Lee; offense level of 21; criminal

6 history category of II, came up with a guideline range of 41 to

7 51 months.  PSR --

8            **MS. GLANTON STEELE:**  Let me just ask again, did you

9 say it was Category II?

10           **MS. MEYER:**  Uh-huh.

11           **MS. GLANTON STEELE:**  And offense level?

12           **THE COURT:**  Twenty-one.

13           **MS. GLANTON STEELE:**  Twenty-one.

14           Okay, go ahead.

15           **MS. MEYER:**  The range was 41 to 51 months.  The PSR

16 came back and recommended a sentence of 41 months.  The

17 sentence imposed by this Court was 36 months.

18           Co-Defendant Derrick Cheung, in the 15-103 case.  His

19 offense level was 16, Criminal History Category I.  Guideline

20 range of 21 to 27 months.

21           The PSR recommended 12 months and a day; and the

22 sentence imposed was 12 months and a day.

23           And in all those cases, the plus-six enhancement was

24 applied by the probation officer.

25           And in all those cases, as the Government has already

1    stated, each of those Defendants engaged in one money

2    laundering deal; not four.

3         **MS. GLANTON STEELE:**  Your Honor, I would like to

4    point out that the Probation Office, in this case, has

5    recommended a five-level departure.

6         The Probation Office, which prepared the Presentence

7    Reports for all of these other Defendants and considered all of

8    their circumstances, also recommended, for Mr. Tan, a five-

9    level departure before the Government asked for two levels for

10   cooperation.

11        And if the Court looks to our initial position paper,

12   at page 15, we have eight, plus eight, plus two -- because it's

13   money laundering -- plus two -- for the agreed upon role

14   adjustment -- plus three -- for acceptance.  And in the

15   footnote, it addresses the six levels.

16        And then it shows that the variance recommended by

17   the probation officer -- minus two for substantial assistance.

18   Then the variance recommended by the probation officer is minus

19   five.  And that is at page 16.

20        So even if the Court would include -- which I believe

21   that a variance is appropriate for the six levels.  Even if the

22   Court would not vary for the six levels, Probation has asked

23   for a five-level variance.

24        And then if the Court goes back to the other

25   Defendants in the other cases -- and as the Government was, you

1    know, very forthcoming for -- forthcoming within the last

2    hearing, Mr. Tan really set up the other transactions, sort of

3    put the people together and off they went -- put the people

4    together and off they went.

5            And in this case, with his wife and Ms. Tat, that's

6    where he had the most involvement.  And the difference between

7    Mr. Tan and the others, I believe -- because I don't know

8    everything -- is he did cooperate.  He met with the Government

9    various times.

10           He attempted to cooperate based on facts and

11   information that happened about nine years before.  And the

12   Government, I think, was very generous in agreeing to two

13   levels for acceptance.

14           But when you look at these other Defendants --

15   Mr. Leung -- the recommendation was 27 to 33 months.

16           But then the pretrial -- sorry -- the probation

17   officer recommended 18 months.

18           So I don't know how many levels that is.  But from 27

19   to 18 months, that's nine months off they recommended for

20   Mr. Leung.  And the Court granted the 18 months sentence.

21           With Mr. Lee, 41 to 51 months; Presentence Report

22   recommended the low end.  And the Court granted a departure or

23   variance down to 36 months; four levels off -- sorry, no --

24   yeah, five levels off.

25           And then with Mr. Cheung, Offense Level 16; Criminal

1    History Category I; 21 to 27 months.  PSR said 12 months and a

2    day.  That's a variance, down from 21 months to 12 months.  So

3    that's ten months off.

4           It seems like, even Defendants that went to trial or

5    did not cooperate are receiving substantial variances.

6           We're asking that the Court -- Probation believed

7    that, when using the six-level enhancement -- a five-level

8    enhancement -- sorry -- a five-level variance was appropriate.

9           We're asking for a six-level variance.  And I won't

10   belabor the point.  But we believe that, under the --

11          **THE COURT:**  Too late.

12          **MS. GLANTON STEELE:**  We believe that, under the

13   circumstances here, the six-level variance, or the five-level

14   variance that's recommended by Probation, should be imposed.

15          **THE COURT:**  Okay, it'll probably come as no surprise

16   to you that I often disagree with Probation.

17          But be that as it may, in any event, more

18   specifically, with respect to your argument that, due to

19   sentencing entrapment, a six-level downward variance is

20   warranted, I disagree.

21          So that request is denied.

22          All right, let's hear from Mr. Tan before we run out

23   of daylight.

24          Mr. Tan, you have the legal right to address the

25   Court on the issue of your sentencing.  Now is that time if you

```
 1   wish to exercise it.
 2          MS. GLANTON STEELE:  Your Honor, could you repeat
 3   that, please.  I don't think the interpreter was interpreting
 4   at the same time.
 5          THE COURT:  Okay, let me put it this way.  Let me
 6   change up.
 7          After listening to and giving due consideration to
 8   the arguments and recommendations of the attorneys, on the
 9   issue of sentencing, I am much more influenced by what the
10   Defendant himself or herself has to say.
11          So I'm really interested in anything that you wish to
12   say to the Court at this time.
13          THE DEFENDANT:  Yes.  Can I say now?
14          THE COURT:  Hang on one second.
15          THE DEFENDANT:  Your Honor, thank you very much for
16   the opportunity for me to speak on my words.
17          And right here, I'm really thankful and appreciate
18   how my representative Counsel Callie.
19          In the past three years, she always accompanied me
20   and spent the time with me in my hard time.  She always with me
21   and try her best to help me and to help me on this case.
22          THE COURT:  Good.  I'm going to reduce her sentence
23   then.  She sounds like she's done a really fine job.
24          Talk to me about you.
25          THE DEFENDANT:  I need to thank my lawyer first.
```

1          **THE COURT:**  Okey-dokey.

2          **THE DEFENDANT:**  And I feel very sorry to my eldest

3   son, Sonny.  Because of my case, it effects two years of

4   college life of him.

5          And I feel so sorry to my parents.  And for this

6   case, it effects the health of their life.

7          I know that in this case I commit a very serious

8   crime.  I'm so worried that I will be deported back to China;

9   because everything I have is in America, including my parents,

10  my wife, my sons, my family, and everything is in America.

11         If I have another chance, I won't commit those crimes

12  anymore.

13         Thank you, your Honor.

14         **THE COURT:**  All right, thank you, sir.

15         **THE DEFENDANT:**  I cannot say more.

16         **THE COURT:**  All right.

17         **MS. GLANTON STEELE:**  Your Honor, there was one other

18  thing I forgot to add.  And I know that it was in the papers.

19         But, at least with -- I don't know everyone's

20  circumstances.  But with respect to two other Defendants, his

21  wife and Vivian Tat, I know that they did receive sentences.

22  But they're not losing their immigration status.

23         Mr. Tan is an LPR, which is one of the reasons why I

24  was asking for CASA, because I was trying to make sure he

25  wouldn't lose his immigration status in light of his

41

circumstances; his two sons that are in college, his father,
who is 90 and cannot travel because of his health conditions,
his mother, who is 70, she also cannot travel, and his mother-
in-law.

You know, many of them, they suffer from dementia and
all sorts of depression, all sorts of problems, such that they
cannot handle a long flight.

So, for Mr. Tan, being deported is a grave punishment
that others did not have to endure.

So we would ask that whatever sentence the Court does
impose, the Court would consider, under 5C1.1(e)(3), it
indicates that, one day in on home detention electronic -- with
electronic monitoring, home detention could be the same as one
day in prison.

So we would ask the Court to sentence to the maximum
term of probation, five years, with whatever sentence the Court
chooses to be on home detention with electronic monitoring.

**THE COURT:** You had asked for 12 months' home
detention.

**MS. GLANTON STEELE:** I did, your Honor. But then I
modified it after our last hearing, and I went up to 18 months.

Because I believed that, based on the range, the
Court indicated it wasn't going to go the whole five from
probation in addition to the other arguments. So I asked for
18 months' home detention with electronic monitoring, with a

1    maximum term of probation.

2              And so whatever sentence that the Court does

3    determine, we would just ask that it be home detention with

4    electronic monitoring.

5              Because as the Court knows, then Mr. Tan would be

6    able to assist his elderly parents and mother-in-law, continue

7    working.  But his confinement would be at home so that he could

8    still take care of them.

9              And then, once this is all over -- and I'm not even

10   sure when the Immigration Court would -- he'd have to address

11   that.

12             But what I was hoping is that he would then be able

13   to fight the immigration issues with a bond while he's out

14   working and taking care of his family.

15             So we would just ask the Court to look closely at

16   5C1.1(e)(3), and consider that option.

17             **THE COURT:**  Okay.

18             **MS. MEYER:**  Your Honor, I'm sorry, but 5C1.1, I don't

19   believe is going to be available as an option, based on the

20   guidelines calculation as the Government did.

21             Remember, the Government only advocated for a plus-

22   two aggravating role -- when PSR aggravated for plus-four and

23   we objected to the plus-four.

24             But under 5C1.1(c) and (d), it talks about the

25   applicable guideline range falling into Zones B or C.

1          And based on the calculation that the Court has come

2    up with, articulated at the beginning of this hearing, I don't

3    believe we are in either of those zones.

4          **MS. GLANTON STEELE:**  Your Honor, that was when the

5    guidelines were mandatory.  Now, the guidelines are advisory.

6          So if the Court wanted to, even though it's in Zone

7    D, the Court could order that Mr. Tan be placed on probation

8    for five years, and that he serve even up to 36 months on home

9    detention with electronic monitoring.

10         But the guidelines, including Chapter 5, are

11   advisory.

12         **THE COURT:**  All right.  All right, Probation made the

13   recommendation for a sentence of 33 months.

14         The Government has made a recommendation for a

15   sentence of 36 months, plus a fine.

16         All right, having considered the sentencing factors

17   enumerated at 18, U.S.C., Section 3553(a), including the

18   advisory guidelines range of 37 to 46 months, based upon an

19   offense level of 21 and a criminal history category of I, it is

20   ordered that the Defendant shall pay to the United States a

21   special assessment of $700, which is due immediately.

22         Any unpaid balance shall be due during the period of

23   imprisonment at the rate of not less than $25 per quarter and

24   pursuant to the Bureau of Prisons inmate financial

25   responsibility program.

1          It is ordered that the Defendant shall pay to the

2   United States a total fine of $10,500 consisting of the

3   following:

4          On Case Number 702, Counts One and Two, a fine of

5   $1,500 on each count.

6          In Case Number 103, Counts One, Two, and Three, a

7   fine of $1,500 on each count.

8          And on Case Number 701, Counts One and Two, a fine of

9   $1,500 on each count.

10          And the total fine shall bear interest, as provided

11   by law.

12          The sum of $1,500 shall be paid immediately.  Payment

13   of the balance shall be due during the period of imprisonment

14   at the rate of not less than $25 per quarter and pursuant to

15   the Bureau of Prisons Inmate Financial Responsibility Program.

16          If any amount of the fine remains unpaid after

17   release from custody, monthly payments of at least $400 shall

18   be made during the period of supervised release.  And these

19   payments shall begin 30 days after the commencement of

20   supervision.

21          Defendant is ordered to comply with General Order

22   Number 18-10.

23          The Court has also found that the property identified

24   in the preliminary order of forfeiture is subject to

25   forfeiture.

1          The preliminary order is incorporated by reference

2     into this judgment and is final.

3          Pursuant to the Sentencing Reform Act of 1984, it is

4     the judgment of the Court that Defendant Jian Sheng Tan, aka

5     Raymond Tan, is hereby committed to the custody of the Bureau

6     of Prisons for a term of 36 months.

7          This term consists of 36 months on each of the

8     following counts:

9          Counts One and Two of Case Number 702; Counts One,

10    Two, and Three of Case 103; and Counts One and Two of Case

11    Number 701.

12         The terms on all of these counts shall be served

13    concurrently.

14         Upon release from imprisonment, he shall be placed on

15    supervised release for a term of two years.  This term consist

16    of two years on each count; that is, Counts One and Two of Case

17    702; Counts One, Two, and Three of Case 103; and Counts One and

18    Two of Case 701.

19         All such terms to run concurrently under the

20    following terms and conditions:

21         One, Defendant shall comply with the rules and

22    regulations of the United States Probation and Pretrial

23    Services Office and General Order 18-10, including the

24    conditions of probation and supervised release set forth in

25    Section 3 of General Order 18-10.

1        Two, Defendant shall not commit any violation of

2   Local, State, or Federal law.

3        Three, during the period of community supervision,

4   Defendant shall pay the special assessment fee and fine in

5   accordance with this judgment's orders pertaining to such

6   payments.

7        Four, Defendant shall comply with the immigration

8   rules and regulations of the United States.  And if deported

9   from this country, either voluntarily or involuntarily, not

10  reenter the United States illegally.

11       Defendant is not required to report to the Probation

12  and Pretrial Services Offices while residing outside of the

13  United States.

14       However, within 72 hours of release from any custody

15  or any reentry to the United States during the period of

16  supervision, Defendant shall report for instructions to the

17  United States Probation Office, located at the United States

18  Courthouse, 312 North Spring Street, Room 600, Los Angeles,

19  California.

20       Five, Defendant shall cooperate in the collection of

21  a DNA sample from himself.

22       Six, Defendant shall apply all monies received from

23  income tax refunds to the outstanding Court-ordered financial

24  obligations.

25       In addition, Defendant shall apply all monies

1  received from lottery winnings, inheritance, judgments, and any

2  anticipated or unexpected financial gains to the outstanding

3  Court-ordered financial obligations.

4          The drug testing condition mandated by statute is

5  suspended, based upon the Court's determination that the

6  Defendant poses a low risk of future substance abuse.

7          It is further ordered that the Defendant surrender

8  himself to the institution designated by the Bureau of Prisons

9  at or before 12:00 noon, on January 15 of 2020.

10          In the absence of such designation, the Defendant

11  shall report on or before the same date and time to the United

12  States Marshal, located at the Roybal Federal Building, 255

13  East Temple Street, Los Angeles, California.

14          And the Court specifically finds that the Defendant

15  does not appear to be either a flight risk or a danger to the

16  community.

17          Now, pursuant to 18, U.S.C., Section 3553(a), the

18  Court is obligated to impose a sentence that is sufficient, but

19  not greater than necessary, to comply with the purposes of

20  3553(a)(2).

21          In determining the particular sentence to be imposed,

22  the Court has considered the nature and circumstances of the

23  offense, as well as the history and characteristics of the

24  Defendant.

25          The Court has recognized the need for the sentence

1    imposed to reflect the seriousness of the offense, that it

2    should promote respect for the law, it should provide just

3    punishment for the offense, afford adequate deterrents to

4    future criminal conduct, protect the public from further crimes

5    of the Defendant, and provide the Defendant with needed

6    correctional treatment in the most effective manner.

7         The Court has considered the various kinds of

8    sentences available, the guideline sentencing range, and

9    recognized the need to avoid unwarranted sentence disparities

10   among Defendants with similar records who had been found guilty

11   of similar conduct.

12        From late 2009, through late 2010, Mr. Tan conspired

13   to launder funds, and he engaged in the activity of actually

14   laundering funds.

15        In a series of transactions, Mr. Tan was involved in

16   schemes to launder more than $100,000.  In one of the schemes,

17   Mr. Tan structured the transactions to avoid IRS reporting

18   requirements.

19        The combined offense was fairly serious.  $100,000 is

20   not an insignificant amount.  The offense was not particularly

21   sophisticated or complex.  And he obtained cashier's checks in

22   false names.

23        Yet, Mr. Tan was sophisticated enough to structure

24   some of the transactions in order to successfully launder funds

25   and avoid IRS scrutiny.

 1          In aggravation, he breezily acknowledges the alleged

 2     source of the funds; that is, drug transactions, and was the

 3     leader of others.

 4          In mitigation, however, the instant offenses took

 5     place almost a decade ago.

 6          Overall, Mr. Tan has shown a high degree of respect

 7     for the law.  He has no other contacts with law enforcement.

 8          In addition, there is no evidence to suggest any

 9     other illegal activity on Mr. Tan's part either before or after

10     the incident offenses.

11          However, it appears that just punishment and adequate

12     deterrence require a custodial sentence.  Again, his role as

13     leader in the offense and his continued conduct in the incident

14     offenses support a higher degree of punishment.

15          It appears he has a strong network of family and

16     friends.  However, at this point, public protection appears to

17     be of minimal concern.

18          While his prospective incarceration will undoubtedly

19     deter any further personal criminal conduct, general deterrence

20     must also be considered.  And a custodial sentence sends a

21     message to the general public that serious consequences arise

22     from laundering of drug money.

23          All right, Mr. Tan, you have the right to appeal your

24     conviction if you believe your guilty plea was somehow unlawful

25     or involuntary or if there was some other fundamental defect in

50

the proceedings that was not waived by your guilty plea.

However, a Defendant may waive those rights as part of a plea agreement.  And you have entered into a plea agreement that waives some or all of your right to appeal the sentence itself.

In this particular case, you entered into a plea agreement that provided a waiver of any challenge to your sentence itself so long as the Court imposed a term of imprisonment consistent with an offense level of 23 or lower.

In this particular case, the sentence imposed is commensurate with an offense level of 21.  Such waivers are generally enforceable.

If you believe your waiver is unenforceable, you may present that theory to the Court of Appeals.

With few exceptions, a notice of appeal must be filed within 14 days of judgment being entered.

Do you understand that, sir?

**THE DEFENDANT:**  Understand.

**THE COURT:**  If you are unable to afford a transcript of the record in this case, one will be provided at Government expense.

If you are unable to pay the cost of an appeal or the filing fee, you may apply within 14 days for a waiver.

If you do not have an attorney to act on your behalf, and if you request it, the Clerk of the Court will prepare and

1   file a Notice of Appeal on your behalf.  But, again, you must

2   make the request within 14 days.

3          The Notice of Appeal must designate the judgment or

4   order appeal from and the fact that you are appealing to the

5   Court of Appeals.

6          It should also designate that portion of the

7   proceedings not already on file that you deem necessary for the

8   reporter to include.

9          Also in this consideration, the Court has evaluated

10  the sentencing guidelines, as required by 18, U.S.C., Section

11  3553(a)(4), and finds the calculations of suggested sentence

12  therein for this Defendant, under the present circumstances, to

13  be reasonable.

14          The Court, therefore, sentences the Defendant as

15  previously stated.

16          **MS. MEYER:**  Your Honor, may I make one --

17          **THE COURT:**  Yes.

18          **MS. MEYER:**  -- clerical correction?

19          The Court indicated that the sentence -- the

20  custodial sentence of 36 months imposed was consistent with an

21  offense level of 21.

22          It actually would be offense level of 20.

23          The offense level for the range associated with

24  offense level 21 begins with 37 months.

25          **THE COURT:**  Why don't I give Ms. Glanton Steel her

1    downward variance?  Not hers, but --

2              **MS. GLANTON STEELE:**  No objection.

3              **THE COURT:**  -- one level.

4              All right.  I don't believe there are any unaccounted

5    for counts in these indictments.

6              **MS. MEYER:**  That's correct, your Honor.

7              **THE COURT:**  All right, your bond will be exonerated

8    upon your surrender, sir.

9              Anything else, Ms. Glanton Steel?

10             **MS. GLANTON STEELE:**  Yes, your Honor.  We would

11   object to the imposition of a fine.

12             Based on his cash flow -- that was based on him

13   working.  And he won't be working, since he's going into

14   custody.

15             And his cash flow, under the Presentence Report, is

16   about $1,600.  So the fine of $10,500 is not a fine that he'll

17   be able to pay, especially in light of the fact that the Court

18   has sentenced him to a three-year sentence.

19             So we would object to the fine.

20             Also, we had asked the Court, in the third condition,

21   to add, "Unless the Defendant demonstrates an inability to

22   pay."

23             Because it says that during the period of community

24   supervision, the Defendant shall pay the special assessment and

25   fine in accordance with this judgment's -- oh, actually, that's

```
 1   not the one.  Hang on a second.

 2              THE COURT:  I know what you're thinking of.  But we

 3   don't have a --

 4              MS. GLANTON STEELE:  Oh, yeah.  Never mind, your

 5   Honor.  Please --

 6              THE COURT:  I know what you mean.

 7              MS. GLANTON STEELE:  -- disregard that.

 8              THE COURT:  All right, your objection is noted.

 9              And as you well know, if Probation ultimately

10   determines that he has no ability to pay, Probation will bring

11   that to the Court's attention, and we will revisit it, okay?

12              MS. GLANTON STEELE:  Yes, your Honor.

13              I have one other objection.  And that would be --

14              THE COURT:  Sure.

15              MS. GLANTON STEELE:  We would ask that the Court --

16   the Court indicated that he would have to pay the fine during

17   imprisonment, at $25 per quarter, I believe.

18              We would ask --

19              THE COURT:  Yes.

20              MS. GLANTON STEELE:  -- that the Court stay the fine

21   until he's released.

22              When our clients work in prison, they get very, very

23   low wages.

24              THE COURT:  Yes.

25              MS. GLANTON STEELE:  I mean, $25 is quite
```

54

1   substantial, especially since Mr. Tan is the main wage earner

2   in his family.

3           So it's going to be very difficult for him while he's

4   in prison and his family is attempting to survive without him.

5           So we would ask that the Court just stay that aspect

6   until he is released.

7           **THE COURT:**  $25 every three months?

8           **MS. GLANTON STEELE:**  Your Honor, sometimes they get a

9   few dollars a day or cents.  So $25 is a lot.

10          And I know a lot of my clients go to places where

11  even phone calls have to be paid for or soap or toiletries.

12          **THE COURT:**  Uh-huh.

13          **MS. GLANTON STEELE:**  And so we would just ask that

14  the Court stay that until he's released.

15          **THE COURT:**  Okay, I'm not inclined to do that.

16          Anything else?

17          Okay, we're done.

18          **MS. MEYER:**  No, your Honor.  Thank you.

19          **(Proceedings Concluded)**

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    November 22, 2019
        Signed                                        Dated


                    *TONI HUDSON, TRANSCRIBER*